**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| FEI GUAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. _____ |
| BING RAN; ALICE GUAN; | ) | |
| ADVANCED SYSTEMS TECHNOLOGY | ) | **JURY TRIAL DEMAND** |
| AND MANAGEMENT, INC.; and | ) | |
| QI TECH, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Fei Guan, by counsel, moves this Court for entry of judgment in his favor, and against Defendants Bing Ran, Alice Guan[1], Advanced Systems Technology and Management, Inc. and Qi Tech, LLC (collectively, "Defendants"), and in support of such complaint alleges and avers as follows:

## NATURE OF ACTION

This action states federal claims for violation of the Trafficking Victims Protection Reauthorization Act of 2003 and Virginia common law, and to recover unpaid wages and interest thereon, as well as compensatory damages, punitive damages, and such other relief as this Court deems just and proper.

## PARTIES

---

[1] Defendant changed her name from "Yue Guan" to "Alice Jin Yue Guan" in 2009, and reference may be made to her by either name.

1.      Plaintiff Fei Guan ("Mr. Guan") was born in China. He is a lawful permanent resident of the United States and resident of the Commonwealth of Virginia.

2.      Mr. Guan graduated from Tsinghua University in Beijing, China in 1996 with a major in Electronics and a minor in Mechanical Engineering. Mr. Guan came to the United States on a temporary H-1B work visa sponsored by AdSTM in September of 2008.

3.      Defendant Alice Guan ("Ms. Guan"), Mr. Guan's sister, was born in China and is a naturalized United States citizen and a current resident of the State of Florida. Ms. Guan formed AdSTM, a Virginia corporation, in 1996 as its sole owner. Ms. Guan was married to Bing Ran from April 3, 1985 to October 29, 2006.

4.      Defendant Bing Ran ("Mr. Ran"), Ms. Guan's former husband, was born in China and is a naturalized United States citizen and resident of the Commonwealth of Virginia. Mr. Ran began assisting Ms. Guan with the operation of AdSTM in or around the year 2000. Mr. Ran was married to Ms. Guan from April 3, 1985 to October 29, 2006.

5.      Defendant Advanced Systems Technology and Management, Inc. ("AdSTM"), is a science and technology-based engineering and consulting firm with its principal place of business and headquarters in Northern Virginia. Ms. Guan and Mr. Ran own AdSTM together, although their particular ownership percentages and level of control have been the subject of lengthy litigation.

6.      At all times relevant to this Complaint, either Ms. Guan or Mr. Ran, or both Ms. Guan and Mr. Ran, served as a corporate officer of AdSTM.

7.      Defendant Qi Tech, LLC ("Qi Tech") is a limited liability company formed in the Commonwealth of Virginia with its principal place of business and headquarters in Northern

Virginia. Under Mr. Ran's direction, Qi Tech entered into a series of agreements with AdSTM, under which AdSTM agreed to provide various forms of management assistance to Qi Tech.

8.      At all times relevant to this Complaint, Mr. Ran served as a corporate officer of Qi Tech.

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States; specifically, the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPA")18 U.S.C. §§ 1581-1597.

10.     This Court has supplemental subject matter jurisdiction over Mr. Guan's state law claims pursuant to 28 U.S.C. § 1367.

11.     Ms. Guan and Mr. Ran are subject to personal jurisdiction of the Court in this District, because Mr. Guan's claims arise out of Defendants' conduct which occurred in this District.

12.     Ms. Guan and Mr. Ran regularly conduct business within this judicial district.

13.     AdSTM and Qi Tech are subject to personal jurisdiction of the Court in this District because they regularly conduct business within this judicial district.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants conduct business within this judicial district and the events described in this action took place within this judicial district.

## BACKGROUND

**Offer of Employment and Visa Sponsorship of Mr. Guan by AdSTM**

15.     Ms. Guan founded AdSTM in 1996.

16.     Ms. Guan and Mr. Ran began operating AdSTM together in approximately the year 2000. Ms. Guan offered Yu Guan, Mr. Guan's brother, a position at AdSTM in the fall of 2007. Yu Guan accepted the position and he relocated to the United States under a temporary H-1B work visa sponsored by AdSTM.

17.     Once approved, a temporary H-1B work visa sponsored by an employer grants the visa holder the legal immigration status required to stay in the United States to temporarily work for that employer for a certain period of time.

18.     Ms. Guan hired Yu Guan and completed his immigration paperwork on behalf of AdSTM.

19.     Similarly, Ms. Guan offered Mr. Guan a position at AdSTM in early 2008, while he resided in Japan.

20.     Ms. Guan provided Mr. Guan an offer letter dated February 28, 2008 on which the salary to be provided to Mr. Guan was left blank, but on which Ms. Guan indicated Mr. Guan would be paid "slightly above the labor department's quoted annual salary." *See*, Exhibit B, "Offer Letter."

21.     Ms. Guan verbally represented to Mr. Guan that his salary would be approximately $70,000 or $80,000 per year, and that this was an appropriate annual salary for a data analyst or system analyst to earn in the United States.

22.     To the best of Mr. Guan's knowledge, the salary range Ms. Guan represented was appropriate for a data or system analyst in the United States.

23.     Mr. Guan accepted the position with the salary as described by Ms. Guan.

24.     Ms. Guan hired an immigration attorney to complete Mr. Guan's paperwork for his temporary H-1B work visa. She signed the visa documents on behalf of AdSTM.

25.     AdSTM submitted the H-1B work visa application in April of 2008, indicating that Mr. Guan would be working at a proposed wage rate of $51,168.00 per year, citing the source for this amount as the prevailing wage rate per the Occupational Employment Statistics ("OES") produced by the Department of Labor.

26.     Before Mr. Guan arrived in the United States, Ms. Guan arranged for Mr. Guan to lease a home she owned from her.

27.     Mr. Guan relocated to the United States on an H-1B work visa in or around the last week of September 2008 for the purpose of beginning work at AdSTM.

28.     Mr. Guan's wife and child obtained H4 visas and relocated with Mr. Guan to the United States.

29.     Beginning in September of 2008, Ms. Guan charged Mr. Guan $1300.00 per month to live at the home she owned, and required that Mr. Guan pay her monthly in cash.

30.     Beginning in September of 2009, Ms. Guan required that Mr. Guan pay the utilities for the property in addition to Mr. Guan's monthly payment to her of $1300.00.

31.     Mr. Guan and his family resided at the home owned by Ms. Guan until June of 2012 in accordance with this arrangement.

**PSA and Amendments**

32.     Ms. Guan and Mr. Ran separated on October 29, 2006 and entered into a Parenting, Support, and Property Settlement Agreement ("PSA") shortly thereafter.

5

33.     The PSA set forth various terms regarding the management and ownership of AdSTM, including a transfer of management and ownership of the company from Ms. Guan to Mr. Ran to occur on July 5, 2008. *See* Exhibit A, "PSA."

34.     On or about June 4, 2008, Mr. Ran learned that he would not be able to take a majority position in AdSTM on July 5, 2008 as planned and agreed upon in the PSA.

35.     Due to Small Business Administration regulations, Ran was not willing to purchase fifty-one percent (51%) of AdSTM at that time, and chose to remain a 49% owner of the corporation until the last of AdSTM's Section 8(a) contracts had expired.

36.     As a result, on or about June 9, 2008, Mr. Ran and Ms. Guan began negotiating an amendment to the PSA.

37.     On or about June 10, 2008, prior to Mr. Guan's arrival in the United States, Ms. Guan and Mr. Ran agreed upon an amendment to the PSA ("June 2008 Amendment") which, in part, provided for the employment of Ms. Guan's two brothers under the following terms:

> As long as AdSTM has revenue of not less than $3M/year, Bing Ran and AdSTM shall employ Yu Guan and Fei Guan continuously for 5 years (for Yu Guan: starting from July 1, 2008. For Fei Guan: starting October 1, 2008), and proactively sponsor their H-1 and Green Card processes. Each of their salary will be $75K/year. Each of them will give Bing Ran half of their net income from AdSTM. If they purposely do not pay Bing on a monthly basis and even refuse to pay Bing after Bing's reminder, then Bing and AdSTM have no obligation to pay and hire them. Yue Guan agrees not to compete with AdSTM in any way during this 5-year period and this commitment will not expire even if Yu and Fei Guan breach the contract.

38.     Before executing the agreement, neither Ms. Guan nor Mr. Ran informed Mr. Guan of the June 2008 Amendment or the effect it would have on the terms of Mr. Guan's employment at AdSTM.

39.     Mr. Guan never agreed to the terms contained in the June 2008 Amendment.

40.     In July of 2008, Ms. Guan withdrew approximately $2.5 million from AdSTM.

41.     As a result of Ms. Guan's unexpected withdrawal of money from AdSTM, Ms. Guan and Mr. Ran began renegotiating the June 2008 Amendment to the PSA.

42.     Unbeknownst to Mr. Guan, on or around October 15, 2008, Ms. Guan and Mr. Ran executed a formal amendment to the PSA they had entered into during their divorce proceedings.

43.     This amendment to the PSA formalized the negotiations that had taken place between Ms. Guan and Mr. Ran for the past several months, and included terms relevant to Mr. Guan's employment. *See* Exhibit C, "October 2008 Amendment."

44.     The October 2008 Amendment addressed and altered the terms of Mr. Guan's employment, as well as the employment of his brother, Yu Guan, by AdSTM in accordance with the following provision, found in Paragraph 10 of the Amendment, in relevant part:

> As long as AdSTM has annual revenue of not less that $3 million dollars/year, Yu Guan will be employed until 2/1/2011, and Fei Guan will be employed until 10/14/2011. Fei Guan's salary will be $75,000/year and Yu Guan's salary will be $90,000/year starting 10/16/2008. Each of them will give Bing Ran half of their net incomes from AdSTM (except Yu Guan can keep his income for the period of 7/1/2008 to 10/15/2008). If they do not pay Bing on a monthly basis and still do not pay Bing after Bing's reminder, then their employments with AdSTM shall be terminated. However, if they work on projects later and their hours are charged to the government as direct labors, then they shall not pay Bing for any those incomes. After AdSTM's annual revenue drops below $3 million dollars/year, Yu Guan and Fei Guan will be continually hired by AdSTM without pays and they will pay their insurances through AdSTM plan.

45.     The October 2008 Amendment further stated that "Bing agreed to hire Fei by H1 visa. AdSTM shall continue to support Yu Guan and Fei Guan's H1 and Green card visas."

46.     Mr. Guan was not a party to the October 2008 Amendment to the PSA.

47.     Mr. Ran and Ms. Guan signed the October 2008 Amendment without discussing or disclosing any of the provisions with Mr. Guan.

48.     Neither Mr. Ran nor Ms. Guan provided a copy of the October 2008 Amendment to the PSA or any of the provisions therein to Mr. Guan for his review.

49.     Neither Mr. Ran nor Ms. Guan informed Mr. Guan of the existence of the October 2008 Amendment prior to, or after, its execution.

50.      Both Mr. Ran and Ms. Guan began operating under the October 2008 Amendment to the PSA following its execution.

51.     The October 2008 Amendment conferred a financial benefit upon Mr. Ran, as it entitled him to half of Mr. Guan and Yu Guan's net income at AdSTM for a period of three (3) years.

52.     The October 2008 Amendment conferred a financial benefit upon Ms. Guan, as Paragraph 2 of the Amendment released Ms. Guan from any obligation to repay the amount of approximately $2.5 million she withdrew from AdSTM.

53.     Further, Paragraph 7 of the October 2008 Amendment provided for a substantially larger income for Ms. Guan from AdSTM than she initially was entitled to under the original PSA.


**Effect of PSA on Mr. Guan and Payments Made to Mr. Ran**

54.     After moving to the United States in September of 2008, but prior to Mr. Guan's first day of work at AdSTM, Ms. Guan informed Mr. Guan that he would be required to pay one half of the net income he earned at AdSTM every month to Mr. Ran.

55.     Ms. Guan informed Mr. Guan that if he failed to make these payments, his employment would be terminated and he would have to leave the United States.

56.     Ms. Guan informed Mr. Guan he was required to make these payments based on an agreement between Ms. Guan and Mr. Ran.

57.     Ms. Guan did not show Mr. Guan the actual agreement, nor did Mr. Guan know that an actual written agreement containing these terms existed.

58.     Ms. Guan asked if Mr. Guan had a problem with the agreement. Mr. Guan expressed his concerns with the agreement, but felt compelled to accept the arrangement.

59.     Ms. Guan told Mr. Guan that Mr. Ran had the ability to make him pay, referring to Mr. Ran's ability to terminate Mr. Guan and force him to return to China unless he paid Mr. Ran.

60.     Mr. Guan was fearful for his immigration status if he was terminated, knowing that he needed an employer to sponsor his H-1B work visa.

61.     Mr. Guan was also fearful for the immigration status of his family, who also relied on his H-1B work visa to remain in the United States on their H4 visas.

62.     As Mr. Guan understood this threat, he had only had two options: pay one half of his net income to Mr. Ran or face the deportation of himself and his family after his immediate termination from AdSTM.

63.     Mr. Guan was unable to work for any other individual or company in the United States under the terms of his H-1B work visa.

64.     Mr. Guan's wife was unable to seek employment in the United States under the terms of her H4 visa.

65.     Mr. Guan had no option but to make the payments to Mr. Ran.

66.     Mr. Guan began his employment at AdSTM on or about October 1, 2008.

67.     Mr. Guan began his employment at AdSTM working primarily from home and under the direction and supervision of Ms. Guan.

68.     Mr. Guan was informed by AdSTM that his annual salary would begin at $75,000.00, or $36.06 per hour, an amount within the range represented to Mr. Guan by Ms. Guan in connection with the offer of employment to Mr. Guan prior to his immigration to the United States.

69.     Beginning in October of 2008, under penalty of immediately losing his new employment and immigration status, Mr. Guan sent a check in the amount of half of his net income earned at AdSTM via the United States Postal Service to Mr. Ran's home address.

70.     Mr. Guan continued sending a check every month in the amount of half of his net income earned at AdSTM via United States Postal Service to Mr. Ran's home address on a monthly basis. *See* Exhibit D, "Payments from Mr. Guan to Mr. Ran."

71.     During Mr. Guan's first year of employment, AdSTM paid Mr. Guan at the agreed upon rate of $75,000.00 annually and taxes were withheld from each of Mr. Guan's paychecks accordingly.

72.     Mr. Guan's net income, after tax for his first year of employment at AdSTM was $52,108.38.

73.     From his after tax income, Mr. Guan paid Mr. Ran a total amount of approximately $26,114.20 during his first year of employment at AdSTM.

74.     In addition to the amounts paid to Mr. Ran, Mr. Guan paid his sister, Ms. Guan, $15,600 in rent during his first year of employment at AdSTM.

75.     After the amounts Mr. Guan was compelled to send to Mr. Ran and Ms. Guan, Mr. Guan's first year of compensation was approximately $10,514.20, with which he supported himself, his wife, and his child.

76.     Over the course of the following year, Mr. Guan had even fewer resources, as Ms. Guan forced him to pay for utilities in addition to rent.

77.     During that year, Mr. Guan had substantially less than $10,000 with which he supported himself, his wife, and his child.

78.     The annual salary earned by Mr. Guan, less his payments to Mr. Ran, was substantially less than the $75,000.00 annual salary represented to Mr. Guan by Ms. Guan in her offer of employment.

79.     The annual salary earned by Mr. Guan, less his payments to Mr. Ran, was less than the $51,168.00 annual salary AdSTM represented it would be paying Mr. Guan in Mr. Guan's temporary H-1B work visa application.

80.     The annual salary earned by Mr. Guan, less his payments to Mr. Ran, was less than the $51,168.00 annual salary AdSTM represented as the proposed wage rate and appropriate prevailing wage rate for Mr. Guan's position on Mr. Guan's temporary H-1B work visa application.

81.     Mr. Guan was continually under threat that he and his family would have to leave the United States if he did not make regular payments to Mr. Ran.

82.     On one occasion in early 2011, Mr. Guan did not mail a check to Mr. Ran immediately upon receiving his paycheck because Mr. Ran was away in China.

83.     Ms. Guan immediately called Mr. Guan and asked him why he had not mailed the check. Mr. Guan explained that he had not yet mailed the check because Mr. Ran was in China.

84.     Ms. Guan told Mr. Guan he would have trouble from Mr. Ran if he did not pay.

85.     Mr. Guan interpreted that to mean that he would lose his job if he did not pay immediately.

86.     At that time Mr. Guan had not acquired legal permanent resident status in the United States. As such, he knew that a termination for failure to pay Mr. Ran would result in the loss of his temporary H-1B work visa.

87.     Mr. Guan's wife, based on her status as an H4 dependent visa-holder, was not permitted to work in the United States.

88.     In addition to the financial implications of losing his position at AdSTM, Mr. Guan's family would also be forced to leave the United States if Mr. Guan was terminated.

89.     The last payment Mr. Guan made to Mr. Ran occurred in August of 2014.

90.     Between October 2008 and August 2014, Mr. Guan paid Mr. Ran a total of approximately $160,000.00 of the net income Mr. Guan had earned at AdSTM.

91.     Between September 2008 and June 2012, Mr. Guan paid Ms. Guan a total of nearly $60,000.00 in rent, not including utilities out of the net income Mr. Guan had earned at AdSTM.


**Mr. Ran's Attempt to Recast Money Paid Under the PSA as a Loan**

92.     In early September 2014, Mr. Guan witnessed an argument between Ms. Guan and Mr. Ran concerning spousal support payments due to Ms. Guan under the PSA.

93.     On the same date, following this argument, Mr. Ran informed Mr. Guan that he was allowed to stop sending Mr. Ran the monthly payments of half of Mr. Guan's net income.

94.     In or around November of 2014, Mr. Ran approached Mr. Guan while he was leaving work and requested that Mr. Guan and Yu Guan sign a legal agreement stating that the payments they had made to Mr. Ran had been a "personal loan."

95.     Mr. Ran had never previously described the money he required Mr. Guan to pay to him as a "loan."

96.     Mr. Ran never previously discussed with Mr. Guan any repayment of funds.

97.     The agreement between Ms. Guan and Mr. Ran laying out the payment requirements did not describe the payments as a "loan."

98.     Upon information and belief, the legal agreement Mr. Ran requested Mr. Guan and Yu Guan sign did not provide for Mr. Ran's repayment of the funds he received as a personal loan from Mr. Guan and Yu Guan.

99.     On information and belief, Yu Guan refused to sign an agreement saying the payment was a loan, so Mr. Ran dropped the issue.

100.    Mr. Guan never signed a document saying the payments were a loan.


**Bonuses Received by Mr. Guan during his Employment at AdSTM**

101.    In or around October of 2010 Mr. Guan began performing work directly for Mr. Ran and under Mr. Ran's supervision at AdSTM's physical office in Vienna, Virginia.

102.    During this time, Mr. Guan began to receive bonuses from Mr. Ran through AdSTM.  See Exhibit E, "Bonus Payments from Mr. Ran to Mr. Guan."

103.    In or around late 2011, Mr. Guan also received one bonus check from Mr. Ran through Qi Tech, a separate business entity described to Mr. Guan as a partner of AdSTM.

104.     AdSTM worked with Qi Tech, and Mr. Guan supported those projects, but Mr. Guan was not a Qi Tech employee.

105.     Mr. Ran was in control of Qi Tech.

106.     Mr. Ran instructed Qi Tech to issue Mr. Guan a bonus.

107.     Mr. Ran signed the bonus check provided to Mr. Guan on behalf of Qi Tech.

108.     Mr. Ran signed the bonus check provided to Mr. Guan on behalf of AdSTM.

109.     In or around October of 2013, Mr. Guan requested that Mr. Ran stop providing him these bonuses, and in exchange Mr. Guan would no longer be required to send Mr. Ran monthly checks containing half of the income Mr. Guan earned from AdSTM.

110.     Mr. Ran denied Mr. Guan's request and demanded that Mr. Guan continue to make the monthly payments to him.

111.     In or around the end of 2011, Esther Purushotham ("Ms. Purushotham"), an accountant at AdSTM informed Mr. Guan that he should not be receiving compensation in the form of bonuses from Qi Tech because he was not an employee of Qi Tech.

112.     Upon information and belief, Ms. Purushotham was employed by AdSTM and served as the Accounting Manager for AdSTM, but performed accounting services for both AdSTM and Qi Tech.

113.     Mr. Guan learned through Ms. Purushotham that, because of his immigration status as a holder of an H-1B visa, he was not permitted to accept payments from any other company aside from his visa sponsor, AdSTM.

114.     Mr. Guan received no further bonuses from Qi Tech.

115.    The total of bonuses received by Mr. Guan from Mr. Ran on behalf of either AdSTM or Qi Tech from approximately October of 2010 until August of 2014, after taxes, was approximately $79,000.00.

116.    Mr. Guan did not receive any bonuses from Mr. Ran on behalf of AdSTM after he stopping making monthly payments to Mr. Ran of half of the income Mr. Guan earned at AdSTM in September of 2014.

**Work Performed by Mr. Guan for Qi Tech without Compensation Pursuant to Mr. Ran's Authority at Qi Tech**

117.    Mr. Guan's H-1B visa was sponsored by AdSTM, and AdSTM was responsible for paying Mr. Guan's salary.

118.    Despite this fact, Mr. Guan was asked to perform certain tasks for Qi Tech, a separate business entity that shared office space with AdSTM.

119.    At Mr. Ran's direction, AdSTM had entered into a number of Mentor/Protégé Agreements with Qi Tech to provide management and support services.

120.    Mr. Ran served as the CEO of Qi Tech and the CEO of AdSTM simultaneously, helped Qi Tech open a bank account, signed almost all of the checks for Qi Tech for many years, managed Qi Tech, and provided substantial loans from AdSTM to Qi Tech.

121.    Mr. Guan, at Mr. Ran's request, purchased computers and other office supplies and equipment for employees of Qi Tech with Mr. Guan's own personal funds and assisted Qi Tech employees with setting up new technology.

122.    Mr. Guan was required to perform work for Qi Tech by Mr. Ran from approximately October of 2010 until August of 2014.

123.     Mr. Guan was issued a number of checks from Qi Tech reimbursing him for the purchases he made on behalf of Qi Tech.

124.     Mr. Guan received approximately 20 checks from Qi Tech in total, all signed by Mr. Ran.

125.     Until 2014, Mr. Ran signed all the Qi Tech checks Mr. Guan received.

126.     Other than a single bonus check, Mr. Guan received no compensation from Qi Tech.

127.     Mr. Ran, on the other hand, received an annual salary from Qi Tech, based in part on the assistance provided to Qi Tech by Mr. Guan.

128.     Mr. Ran received a salary of $170,665.09 from Qi Tech in the year 2010; $183,643.59 in the year 2011; $372,326.72 in the year 2012; $404,724.76 in the year 2013, and $461,795.41 in the year 2014.

129.     Mr. Ran's salary from Qi Tech was separate and apart from the salary he earned at AdSTM.

**COUNT I**
**PEONAGE IN VIOLATION OF THE TVPA**
**18 U.S.C. § 1581A, 18 U.S.C. § 1595**
*Against Defendants Ms. Guan, Mr. Ran and AdSTM*

130.      The allegations in the foregoing paragraphs are incorporated as if realleged herein.

131.     Defendants knowingly and willfully held Mr. Guan to a condition of involuntary servitude for a term in order to satisfy a real or imagined debt, as defined within the peonage provision of the TVPA, 18 U.S.C. § 1581.

132.    Mr. Guan incurred this imagined debt as a result of Ms. Guan and Mr. Ran's contract relating to Mr. Guan's employment.

133.    At all times relevant, either Ms. Guan or Mr. Ran, or both Mr. Guan and Ms. Ran, served as a corporate officer of AdSTM.

134.    Mr. Guan brings these claims pursuant to the civil cause of action for victims of forced labor in 18 U.S.C. § 1595.

135.    In exchange for his continued employment and ability to retain his work-sponsored H-1B visa and stay in the United States along with his family, Mr. Guan was required to pay Mr. Ran half of the net income Mr. Guan earned for work performed at AdSTM.

136.    The requirement that Mr. Guan make these payments to Mr. Ran was the product of the October 2008 Amendment to the PSA agreed upon by Ms. Guan and Mr. Ran.

137.    Despite the terms of the October 2008 Amendment, which required payment by Mr. Guan of half of the net income Mr. Guan earned for only three (3) years, Mr. Ran continued to require Mr. Guan make these payments to him from October of 2008 until August of 2014, or a period of approximately six (6) years.

138.    Mr. Guan was under constant threat of losing his work visa in the event he missed a payment to Mr. Ran.

139.    As the visa status of Mr. Guan's family was dependent on his work visa, the immigration status of Mr. Guan's family was also under constant threat.

140.    At all times relevant to this Complaint, Mr. Ran maintained control of the salary and net profit distribution of AdSTM.

141.    AdSTM, Mr. Ran, and Ms. Guan arranged for Mr. Guan's visa and transport to the United States.

142.     AdSTM, Mr. Ran, and Ms. Guan used their control over Mr. Guan's work visa and the dependent visas of Mr. Guan's family to coerce him to continue to make payments to Mr. Ran.

143.     As a direct and proximate cause of Defendants' actions, Mr. Guan has sustained damages, including economic loss and emotional distress.

144.     Mr. Guan is entitled to recover damages in an amount to be proven at trial, including attorney's fees.

145.     Because of the willful, wanton, and malicious nature of Defendants' actions, the law entitles Mr. Guan to punitive damages.


**COUNT II**
**BENEFITTING FINANCIALLY FROM PEONAGE, SLAVERY, AND TRAFFICKING IN PERSONS IN VIOLATION OF THE TVPA**
**18 U.S.C. § 1593A, 18 U.S.C. § 1595**
*Against All Defendants*

146.     The allegations in the foregoing paragraphs are incorporated as if realleged herein.

147.     Defendants knowingly benefitted financially from participation in a venture which engaged in violation of the peonage provisions of the TVPA, in violation of 18 U.S.C. § 1593A.

148.     Mr. Guan brings these claims pursuant to the civil cause of action for victims of forced labor in 18 U.S.C. § 1595.

149.     Mr. Ran benefitted financially from the collection of one-half of Mr. Guan's net income earned at AdSTM between October of 2008 and August of 2014, a total of approximately $160,000.00.

150.    Ms. Guan agreed to the inclusion of the term requiring Mr. Guan to make these payments to Mr. Ran in the October 2008 Amendment to the PSA entered between Ms. Guan and Mr. Ran.

151.    Additional provisions within the October 2008 Amendment conferred a financial benefit on Ms. Guan exceeding that conferred upon her in the initial PSA.

152.    In accordance with the October 2008 Amendment, Ms. Guan was relieved of any obligation to repay the approximately $2.5 million she withdrew from AdSTM prior to transition of the company's ownership to Mr. Ran.

153.    As a result, Ms. Guan benefitted financially from the payments Mr. Guan was required to make to Mr. Ran.

154.    During the relevant period of time, Mr. Ran and Ms. Guan were both corporate officers of AdSTM, and Mr. Ran was a corporate officer of Qi Tech, and in this capacity they used Mr. Guan's visa and the dependent visas of his family to force Mr. Guan into continued payments.

155.    As a direct and proximate cause of Defendants' actions, Mr. Guan has sustained damages, including emotional distress and economic loss.

156.    Mr. Guan is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

157.    Because of the willful, wanton, and malicious nature of Defendants' actions, the law entitles Mr. Guan to punitive damages.


**COUNT III**
**CONSPIRACY TO VIOLATE THE PEONAGE PROVISION OF THE TVPA**
**18 U.S.C. § 1594, 18 U.S.C. § 1595**
*Against Defendants Ms. Guan, Mr. Ran and AdSTM*

19

158.    The allegations in the foregoing paragraphs are incorporated as if realleged herein.

159.    Defendants knowingly conspired with each other to hold Mr. Guan to a condition of involunatry servitude for a term in order to satisfy a real or imagined debt in violation of the peonage provision of the TVPA, and in violation of 18 U.S.C. § 1594.

160.    Mr. Guan incurred this imagined debt as a result of Ms. Guan and Mr. Ran's October 2008 Amendment to the PSA and the terms related to Mr. Guan's employment.

161.    At all times relevant to this Complaint, either Ms. Guan or Mr. Ran, or both Ms. Guan and Mr. Ran, served as a corporate officer of AdSTM.

162.    Mr. Guan was unaware of the terms of the October 2008 Amendment to the PSA between Ms. Guan and Mr. Ran.

163.    Ms. Guan and Mr. Ran agreed, on behalf of AdSTM, to sponsor Mr. Guan's employment at AdSTM.

164.    Mr. Guan never agreed to the terms Ms. Guan and Mr. Ran laid out in the October 2008 Amendment to the PSA.

165.    Mr. Guan brings these claims pursuant to the civil cause of action for victims of forced labor in 18 U.S.C. § 1595.

166.    Mr. Ran and Ms. Guan negotiated the terms of the October 2008 Amendment for a period of several months prior to the initiation of Mr. Guan's employment.

167.    Mr. Ran and Ms. Guan conspired to enforce the involuntary servitude of Mr. Guan for a term of three (3) years under Paragraph 10 of the mutually agreed upon October 2008 Amendment to the PSA.

168.   As a direct and proximate cause of Defendant's actions, Mr. Guan has sustained damages, including economic loss and emotional distress.

169.   Mr. Guan is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

170.   Because of the willful, wanton, and malicious nature of Defendants' actions, the law entitles Mr. Guan to punitive damages.

**COUNT IV**
**CONSPIRACY TO VIOLATE THE FORCED LABOR PROVISION OF THE TVPA**
**18 U.S.C. § 1594, 18 U.S.C. § 1595**
*Against Defendants Mr. Ran, Ms. Guan and AdSTM*

171.   The allegations in the foregoing paragraphs are incorporated as if realleged herein.

172.   Defendants knowingly conspired with each other to obtain Mr. Guan's labor and services by means of threatened abuse of legal process and/or by means of a scheme, plan, or pattern in violation of the forced labor provisions of the TVPA and in violation of 18 U.S.C. § 1594.

173.   Mr. Guan brings these claims pursuant to the civil cause of action for victims of forced labor in 18 U.S.C. § 1595.

174.   Mr. Ran and Ms. Guan negotiated the terms of the October 2008 Amendment to the PSA for a period of several months prior to the initiation of Mr. Guan's employment at AdSTM.

175.   Mr. Ran and Ms. Guan conspired to hold Mr. Guan in a condition of forced labor under Paragraph 10 of the October 2008 Amendment, which required Mr. Guan be "continually hired without pay" in the event AdSTM's annual revenue dropped below $3 million dollars.

176.     Mr. Guan and Ms. Ran, through the terms of the October 2008 Amendment, conspired to abuse or threaten to abuse the law or legal process "in order to exert pressure on [Mr. Guan] or cause [Mr. Guan] to take some action or refrain from taking some action," as defined in 18 U.S.C. 1589(c)(1).

177.     Ms. Guan and Mr. Ran, through the terms of the October 2008 Amendment, conspired to coerce Mr. Guan into remaining employed by AdSTM and to force Mr. Guan to make payments to Mr. Ran against his will.

178.     At all times relevant to this Complaint, either Ms. Guan or Mr. Ran, or both Ms. Guan and Mr. Ran, served as a corporate officer of AdSTM.

179.     Mr. Guan would not have remained employed by AdSTM under these terms if not for the abuse or threatened abuse of legal process by Ms. Guan and Mr. Ran.

180.     As a direct and proximate cause of Defendants' actions, Mr. Guan has sustained damages, including economic loss and emotional distress.

181.     Mr. Guan is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

182.     Because of the willful, wanton, and malicious nature of Defendants' actions, the law entitles Mr. Guan to punitive damages.


### COUNT V
### UNJUST ENRICHMENT
### QUANTUM MERUIT
#### Against All Defendants

183.     The allegations in the foregoing paragraphs are incorporated as if realleged herein.

184.    From approximately October of 2008 until present, Mr. Guan conferred a benefit on Defendants by rendering services to AdSTM and Qi Tech as a Systems Analyst in good faith and with the reasonable expectation he would be fairly compensated for his services in accordance with representations made by Ms. Guan to Mr. Guan as well as representations by Ms. Guan to the United States Citizenship and Immigration Services made pursuant to AdSTM's application for Mr. Guan's H-1B work visa.

185.    At all times relevant, either Ms. Guan or Mr. Ran, or both Ms. Guan and Mr. Ran, served as a corporate officer of AdSTM.

186.    At all times relevant, Mr. Ran served as a corporate officer of Qi Tech.

187.    Defendants requested and accepted the services performed by Mr. Guan and should have reasonably expected to pay Mr. Guan the full amount of his salary for those services.

188.    All Defendants failed to compensate Mr. Guan for the fair market value of his services.

189.    Ms. Guan and Mr. Ran's requirement that Mr. Guan pay Mr. Ran one-half of his net income earned at AdSTM is against public policy, as evidenced by the Virginia Protection of Employees Act, under § 40.1-29 of the Code of Virginia, which prohibits such kickbacks as a criminal violation punishable as a Class 6 felony.

190.    Defendants unjustly enriched themselves at Mr. Guan's expense, and it would be inequitable for Defendants to be permitted to retain such benefit without paying Mr. Guan the value of the benefit he conferred upon them.

191.    Defendants' conduct was willful and wanton, and demonstrated a conscious disregard for Mr. Guan's rights.

192.     As a direct and proximate result of Defendants' actions, Mr. Guan has suffered economic losses.

193.     Mr. Guan is entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FEI GUAN requests that this Court enter judgment in his favor, and against Defendants on all above-stated counts and further:

(a) Award Mr. Guan compensatory damages, plus past and future pecuniary damages on each of the above-stated Counts in an amount that can only be determined in discovery; and in addition

(b) Award Mr. Guan punitive damages as to each of the above-stated Counts in an amount to be proven at trial; and in addition

(c) Award Mr. Guan attorneys' fees, expert fees, and costs of this action as may be permitted by law; and in addition

(d) Award Mr. Guan such other and further relief as may be appropriate.


## JURY DEMAND

**PLAINTIFF FEI GUAN DEMANDS A TRIAL BY JURY.**


Dated:          March 23, 2017                    Respectfully,


                                   _____/s/_____
                                   Joshua Erlich, VA Bar No. 81298
                                   Davia Craumer, VA Bar No. 87426
                                   Katherine Herrmann, VA Bar No. 83203

THE ERLICH LAW OFFICE, PLLC
2111 Wilson Blvd., Ste. 700
Arlington, VA  22201
Tel:      (703) 791-9087
Fax:      (703) 722-8114
Email:  jerlich@erlichlawoffice.com
             dcraumer@erlichlawoffice.com
             kherrmann@erlichlawoffice.com