**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| FEI GUAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:17-cv-00332 (JCC/IDD) |
| BING RAN; ALICE GUAN; | ) | |
| ADVANCED SYSTEMS MANAGEMENT | ) | |
| AND TECHNOLOGY, INC.; and | ) | |
| QI TECH, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OPPOSITION TO DEFENDANT ALICE GUAN'S**
**MOTION TO DISMISS AMENDED COMPLAINT**

Plaintiff Fei Guan ("Plaintiff" or "Mr. Guan"), by counsel, for his Memorandum in Opposition to Defendant Alice Guan's ("Ms. Guan") Motion to Dismiss his Amended Complaint, states as follows:

**INTRODUCTION**

Plaintiff's Amended Complaint asserts three claims against Ms. Guan under the Trafficking Victims Protection Act of 2000, as amended and reauthorized ("TVPA"): (1) Count I, peonage; (2) Count II, benefitting financially from peonage, slavery, and trafficking in persons; and (3) Count III, trafficking in persons. In addition, Count IV asserts a claim against Ms. Guan for unjust enrichment.

Plaintiff has pled facts in Counts I, II, III and IV that sufficiently allege Ms. Guan's liability for these claims. Plaintiff should be permitted to proceed on all four counts against Defendant.

## BACKGROUND

Ms. Guan's Motion to Dismiss is clear in its implication that Ms. Guan does not believe the TVPA should apply to Mr. Guan. *See* Alice Guan's Mot. to Dismiss Am. Compl. Ms. Guan cites some of the policy reasons for the enactment of the TVPA, implying the law is designed to protect women and children, but not people like her brother. *Id*. at p. 8. Ms. Guan states that "Plaintiff is a well-educated, well paid individual who has had the freedom to leave his employment at AdSTM at any time, to go where he wants and to associate with anyone including his family living in the area." Alice Guan's Mot. to Dismiss Am. Compl. at p. 2.

Ms. Guan's Motion to Dismiss does not reflect an accurate or modern understanding of human trafficking. The intent of Congress in passing the TVPA is multi-faceted and extends beyond the limited purpose provided by Defendant. Defendant cites to one population, women and children, that the laws were intended to protect, but ignores the evidence of congressional intent directly applicable to the case at hand. 22 U.S.C. § 7101. The language of Section 7101 states, in pertinent part:

> (b)(3) Trafficking in persons is not limited to the sex industry. This growing transnational crime also includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide.
>
> . . .
>
> (b)(13) Involuntary servitude statutes are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion.

22 U.S.C. § 7101.

Human trafficking among H-1B visa holders in the technology industry is a substantial and serious problem. *See, e.g.*, Matt Smith, Jennifer Gollan and Adithya Sambamurthy, *Job brokers steal wages and entrap Indian tech workers in US*, The Guardian (October 28, 2014),

available at https://www.theguardian.com/us-news/2014/oct/28/-sp-jobs-brokers-entrap-indian-

tech-workers.[1] Beyond that, human trafficking is not limited to women and children. The 2005

reauthorization of the TVPA[2] was premised in part on the finding by Congress that an estimated

600,000 to 800,000 individuals are trafficked across international borders each year and

exploited through forced labor and commercial sex exploitation, and that only an estimated

eighty percent of such individuals are women and girls. Pub. L. 109-164.

## STATEMENT OF FACTS

In 1985, Mr. Ran and Ms. Guan married. Am. Compl. ¶¶ 3-4. In 1996, Ms. Guan formed

AdSTM, a Virginia corporation, as its sole owner; Mr. Ran began assisting with AdSTM's

operation in 2000. Am. Compl. ¶¶ 16-17. Mr. Ran and Ms. Guan separated in 2006, entering into

a Parenting, Support, and Property Settlement Agreement ("PSA") shortly thereafter. Am.

Compl. ¶ 45.

In early 2008, while Mr. Guan was still living in Japan, Ms. Guan offered Mr. Guan a

position at AdSTM for a salary of approximately $70,000 or $80,000 per year. Am. Compl. ¶¶

20-22. Mr. Guan accepted the offer of employment pursuant to these terms. Am. Compl. ¶ 24.

---

[1] According to a report issued by the Polaris Project, the National Human Trafficking Reporting
Center received fifty-two reports regarding human trafficking individuals holding H-1B visas
between August 1, 2014 and July 31, 2015, even though H-1B visa holders make up less than six
percent of the total non-immigrant visa holding population. Polaris Project, *Labor Trafficking in
the U.S.: A Closer Look at Temporary Work Visas* (2015), retrieved from
www.polarisproject.org.

The Department of Justice has been active in investigating and prosecuting human trafficking
that arises from the abuse of H-1B visas. *See e.g.*, Department of Justice, "*Highlands Ranch Man
Found Guilty of Human Trafficking and Other Offenses*," news release, (July 1, 2013), available
at https://www.justice.gov/usao-co/pr/highlands-ranch-man-found-guilty-human-trafficking-and-
other-offenses (last visited June 2, 2017).

[2] Formally, the 2005 Trafficking Victims Protection Reauthorization Act.

Ms. Guan hired an attorney to complete Mr. Guan's paperwork for his H-1B work visa. Am. Compl. ¶ 28. On the visa paperwork, AdSTM represented that Mr. Guan's proposed wage rate would be equal to the prevailing wage rate, $51,168.00 per year. Am. Compl. ¶ 29. Ms. Guan also arranged for Mr. Guan to lease a home she owned. Am. Compl. ¶ 30. Mr. Guan, on an H-1B visa, and his wife and child, on H4 visas, arrived in the United States at the end of September 2008. Am. Compl. ¶¶ 31-32.

In June 2008, Ms. Guan and Mr. Ran negotiated an amendment to the PSA ("June 2008 Amendment") that provided for Mr. Guan and Yu Guan's employment as follows:

> As long as AdSTM has revenue of not less than $3M/year, Bing Ran and AdSTM shall employ Yu Guan and Fei Guan continuously for 5 years (for Yu Guan: starting from July 1, 2008. For Fei Guan: starting October 1, 2008), and proactively sponsor their H-1 and Green Card processes. Each of their salary will be $75K/year. Each of them will give Bing Ran half of their net income from AdSTM. If they purposely do not pay Bing on a monthly basis and even refuse to pay Bing after Bing's reminder, then Bing and AdSTM have no obligation to pay and hire them. Yue Guan agrees not to compete with AdSTM in any way during this 5-year period and this commitment will not expire even if Yu and Fei Guan breach the contract.

Am. Compl. ¶ 51. Ms. Guan and Mr. Ran did not inform Mr. Guan of the terms of the June 2008 Amendment or the effect it would have on his employment prior to his arrival in the United States. Am. Compl. ¶ 52.

After Mr. Guan moved to the United States, but before he began working, Ms. Guan informed Mr. Guan he would be required to pay one half of his AdSTM net income to Mr. Ran every month. Am. Compl. ¶ 70. If Mr. Guan failed to make such payments, his employment would be terminated and he would have to leave the United States because he was here on an H-1B visa. Am. Compl. ¶ 71. Under threat of losing his job and his immigration status, Mr. Guan

had no choice but to agree to pay. Am. Compl. ¶ 74. Mr. Guan began working for AdSTM,

under the direct supervision of Ms. Guan. Am. Compl. ¶¶ 94-95.

In October 2008, Ms. Guan and Mr. Ran negotiated another amendment to the PSA

("October 2008 Amendment") that altered the terms of Mr. Guan and Yu Guan's employment as

follows:

> As long as AdSTM has annual revenue of not less that $3 million
> dollars/year, Yu Guan will be employed until 2/1/2011, and Fei
> Guan will be employed until 10/14/2011. Fei Guan's salary will be
> $75,000/year and Yu Guan's salary will be $90,000/year starting
> 10/16/2008. Each of them will give Bing Ran half of their net
> incomes from AdSTM (except Yu Guan can keep his income for the
> period of 7/1/2008 to 10/15/2008). If they do not pay Bing on a
> monthly basis and still do not pay Bing after Bing's reminder, then
> their employments with AdSTM shall be terminated. However, if
> they work on projects later and their hours are charged to the
> government as direct labors, then they shall not pay Bing for any
> those incomes. After AdSTM's annual revenue drops below $3
> million dollars/year, Yu Guan and Fei Guan will be continually
> hired by AdSTM without pays and they will pay their insurances
> through AdSTM plan.

Am. Compl. ¶ 58. The October 2008 Amendment also required AdSTM to support Mr. Guan's

H1 visa and green card. Am. Compl. ¶ 59. Ms. Guan and Mr. Ran did not inform Mr. Guan of

the terms of the October 2008 Amendment. Am. Compl. ¶ 60.

Also in October 2008, Ms. Guan required Mr. Guan to sign an "Employee Proprietary

Information and Non-Compete Agreement" ("Non-Compete"), which prevented him from

discussing his compensation than anyone other than his immediate supervisor or higher-level

officers at AdSTM. Am. Compl. ¶ 39. The Non-Compete also laid out several other critical

provisions:

> In the event of a breach or threatened breach by Employee of any of

> the provisions of this Agreement, Employee agrees that Employer – in addition to and not in limitation of any other rights, remedies, or damages available to Employer at law or in equity – shall be entitled to a permanent injunction in order to prevent or restrain any such breach by Employee or by Employee's partners, agents, representatives, servants, employees, and/or any and all persons directly or indirectly acting for or with Employee.

Am. Compl. ¶ 40.

> Employee also agrees that for 2 (two) years after Employee is no longer employed by the ASTM, INC., Employee will not directly or indirectly solicit, agree to perform, or perform services of any type that ASTM, INC. can render ("Services") for any person or entity who paid or engaged ASTM, INC. for Services, and with whom Employee had any dealing while employed by ASTM, INC. This restriction also applies to assisting any employer or third party.

Am. Compl. ¶ 41.

> Employee agrees that during the term of his employment with ASTM, INC. he or she shall not submit his or her resume to any prospective employer (including consent to the use of his or her name in a proposal) who is competing against ASTM, INC. for the products and services sold by ASTM, INC.

Am. Compl. ¶ 42. In October 2008, under penalty of losing his new employment and immigration status, began making payments to Mr. Ran. Am. Compl. ¶ 97. As a result of the Non-Compete and the terms of his H-1B visa, Mr. Guan was unable to work with an alternate employer. Am. Compl. ¶ 85.

Mr. Guan sent checks to Mr. Ran's home address every month until August 2014. Am. Compl. ¶ 118. On one occasion in 2011, Mr. Guan did not mail a check to Mr. Ran immediately upon receiving his paycheck because Mr. Ran was in China. Am. Compl. ¶ 112. Ms. Guan called Mr. Guan to ask why he had not mailed the check, and told Mr. Guan he would have trouble from Mr. Ran if he did not pay. Am. Compl. ¶¶ 113-114. Mr. Guan interpreted her statements to mean that he would lose his job if he did not pay immediately. Am. Compl. ¶ 115. At that time,

Mr. Guan was still in the United States on an H-1B visa, and Mr. Guan knew if he was terminated, he and his family would have to leave the United States. Am. Compl. ¶¶ 116-117.

In October 2010, Mr. Ran became Mr. Guan's immediate supervisor. Am. Compl. ¶ 130. At Mr. Ran's direction, Mr. Guan began performing work, purchasing computers and other supplies, for Qi Tech, a separate business entity that Mr. Ran controlled. Am. Compl. ¶ 134; Am. Compl. ¶ 150. During the same time period, Mr. Guan began receiving bonuses from Mr. Ran through AdSTM. Am. Compl. ¶ 131. In late 2011, Mr. Guan received one bonus check from Mr. Ran through Qi Tech and received reimbursements purchasing Qi Tech supplies, but did not otherwise receive compensation from Qi Tech. Am. Compl. ¶ 152; Am. Compl. ¶ 155. Toward the end of 2011, Esther Purushotham ("Ms. Purushotham"), an accountant at AdSTM who also performed accounting services for Qi Tech, informed Mr. Guan that he should not be receiving compensation in the form of bonuses from Qi Tech because he was not an employee of Qi Tech. Am. Compl. ¶ 140. In October 2013, Mr. Guan requested that he stop receiving bonuses from Mr. Ran, and in exchange he would no longer be required to pay one half his net salary to Mr. Ran. Am. Compl. ¶ 138. Mr. Ran denied Mr. Guan's request and continued to demand monthly payments. Am. Compl. ¶ 139. In total, Mr. Guan received approximately $79,000.00 in bonuses after taxes. Am. Compl. ¶ 144.

In November 2014, Mr. Ran approached Mr. Guan and requested that he sign a legal agreement saying the monthly payments Mr. Guan made had been a "personal loan." Am. Compl. ¶ 123. Mr. Ran had never previously described the payments as a loan. Am. Compl. ¶ 124. The June 2008 Amendment and October 2008 Amendment did not describe the payments as a loan. Am. Compl. ¶ 126. Mr. Guan never signed an agreement saying the payments were a loan. Am. Compl. ¶ 129.

In total, Mr. Guan paid Mr. Ran approximately $160,000.00 of the net income Mr. Guan earned at AdSTM. Am. Compl. ¶ 119. In total, Mr. Guan paid Ms. Guan nearly $60,000.00 in rent, not including utilities, of the net income Mr. Guan earned at AdSTM. Am. Compl. ¶ 120.

## ARGUMENT

### Rule 12(b) Standard

Rule 8 of the Federal Rules of Civil Procedure provides that "a pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of the claims, or the applicability of defenses." *Presely v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). Instead, at the pleading stage, a court assumes the truth of all facts alleged in the complaint and must construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

More recently, the Supreme Court has explained that, to survive a motion to dismiss, a complaint must contain factual information to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint can withstand a motion to dismiss "even if it appears 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Finally, in *Aschcroft v. Iqbal*, 556 U.S. 662, 663 (2009), the Supreme Court further explained that to achieve facial plausibility, a complaint

should contain sufficient factual allegations to support a reasonable inference that defendant is liable for the misconduct alleged. *See id*. at 663.

**Alice Guan Individually**

Ms. Guan is incorrectly states that there are no allegations against her individually. Alice Guan's Mot. to Dismiss Am. Compl. at p. 4. Ms. Guan cites to paragraph 7 of the Amended Complaint in support of her contention that there are no allegations against her personally, stating, "At all times relevant to this [Amended] Complaint either Ms. Guan or Mr. Ran, or both, acted as agents of AdSTM." Am. Compl. ¶ 7. This is merely an indication that during the relevant time, one of the two individual Defendants, either Ms. Guan or Mr. Ran, always acted as an agent of AdSTM; it is not an allegation that Ms. Guan acted only in that capacity.

Indeed, there are multiple allegations regarding Ms. Guan in her personal capacity, including negotiations about her Parenting, Support, and Property Settlement Agreement ("PSA") and amendments thereto; Ms. Guan's failure to inform Mr. Guan about the terms of the PSA and amendments thereto; negotiations with Mr. Guan about leasing her house and paying for utilities; and picking up and transporting Mr. Guan and his family within Virginia. Am. Compl. ¶¶ 30; 33-36; 45; 49; 52; 56; 63. Taking the allegations in the light most favorable to the Plaintiff, as is required at this stage in litigation, Plaintiff has made sufficient allegations against Ms. Guan personally to proceed against Ms. Guan in her individual capacity. This Court should deny Ms. Guan's Motion to Dismiss on this ground.

**Trafficking Victims Protection Act**

As an initial matter, Ms. Guan contends that to be held liable for violations of the Trafficking Victims Protection Act ("TVPA"), she must have been "adjudged guilty" of

peonage, slavery, involuntary servitude or forced labor. Alice Guan's Mot. to Dismiss Am. Compl. at p. 4. This assertion is a misstatement of the law, and Ms. Guan cites no law in support of this assertion. The TVPA specifically provides for a civil remedy for violations separate and apart from any criminal action. 18 U.S.C. § 1595. Though it provides that a civil action under Section 1595 "be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim," it does not require a criminal conviction as a prerequisite to bringing a civil action. *Id.*; *see also, e.g. Muchira v. Al-Rawaf*, 850 F.3d 605, 616 (4th Cir. 2017).

Though Ms. Guan combines Counts I (Peonage), II (Benefitting Financially from Peonage, Slavery, and Trafficking), and III (Trafficking) of the Amended Complaint and argues that none of them are viable, they are individual claims and should be evaluated as such.

I. **DEFENDANT'S MOTION TO DISMISS COUNT I OF PLAINTIFF'S AMENDED COMPLAINT SHOULD BE DENIED, AS MR. GUAN HAS ALLEGED FACTS SUFFICIENT TO DEMONSTRATE HE WAS HELD TO A CONDITION OF PEONAGE BY MS. GUAN.**

The TVPA authorizes a civil claim against anyone who "holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage." 18 U.S.C. § 1581(a). Peonage is "compulsory service in payment of a debt." *United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009) (quoting *Bailey v. Alabama*, 219 U.S. 219, 242 (1911)). Compulsory service is the equivalent of involuntary servitude, defined by the Supreme Court as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Bailey* 219 U.S. at 243. Ms. Guan claims that because Plaintiff denied the money he gave to Mr. Ran was a loan, Plaintiff has expressly denied that any

debt existed. Alice Guan's Mot. to Dismiss Am. Compl. at p. 5. Ms. Guan has misread those facts and has ignored multiple other critical allegations in this matter.

In November 2014, Mr. Ran asked Mr. Guan to characterize the money Mr. Guan gave to Mr. Ran as a loan. Am. Comp. ¶¶ 121-129. Mr. Ran's attempt to recast Mr. Guan's payments to him as a loan are not relevant to the underlying facts of Mr. Guan's situation. Mr. Guan, in fact, did not loan any funds to Mr. Ran. Id. There were no loan documents. Am. Compl. ¶ 129. There were no repayment terms, interest, or prior discussion of the payments under the PSA as a loan. Am. Comp. ¶¶ 121-129. After Mr. Guan refused to accede to Mr. Ran's demands, Mr. Ran dropped his demands. Am. Compl. ¶ 128. Mr. Ran's attempt to use his fundamentally coercive over Mr. Guan to change the characterization of the funds at issue is irrelevant to a determination of whether Mr. Guan was being held to a condition of peonage.

Moreover, Ms. Guan's contention that there "is no such thing as an imagined debt for the purposes of the claim of peonage" is inaccurate and not supported by law. Alice Guan's Mot. to Dismiss Am. Compl. at p. 5. Because the focus of the peonage statute is on the behavior of the defendant, the existence of an actual debt is not determinative to the issue of whether the defendant held an individual to a condition of peonage. In considering Section 1581, the Court must determine whether the defendant "kept the person to satisfy a real or imagined debt, regardless of amount." *United States v. Sabnani*, 539 F. Supp. 2d 617, 629 (E.D.N.Y. 2008). Even if there is no actual debt, a defendant holding an individual to satisfy a perceived debt can still be found liable for peonage under Section 1581.

In the PSA and amendments thereto, Ms. Guan and Mr. Ran agreed that Mr. Guan owed Mr. Ran one half of his net salary every month. Ex. A to Am. Compl. at ¶ 10. Ms. Guan informed Mr. Guan of the agreement and threatened that he would lose his job if he did not pay

Mr. Ran in a timely fashion every month. Am. Compl. ¶ 71. Mr. Guan was not a party to that agreement, nor was he aware of the agreement prior to his arrival in the United States. *Id.* at ¶¶ 25-26. When Mr. Guan arrived, he was forced to work for Mr. Ran and Ms. Guan and to provide large sums of money to Mr. Ran to satisfy the financial obligations set forth in the PSA and its amendments.

To the extent that Mr. Guan's claim of peonage requires a finding that Ms. Guan held Mr. Guan to a condition of involuntary servitude, Ms. Guan's contention that such a finding requires "physical restraint and complete psychological domination" is inaccurate, antiquated, and relies on precedent dating back decades before the enactment of the TVPA. Alice Guan's Mot. to Dismiss Am. Compl. at p. 5 (citing *Turner v. Unification Church*, 743 F. Supp. 367 (D.R.I. 1978)). The standard for coercion argued by Ms. Guan fails to take into consideration the congressional intent behind the enactment of the TVPA that "involuntary servitude statutes are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion." 22 U.S.C. § 7101. Under the current law, to establish a claim of involuntary servitude, the plaintiff must show that the individual was held to a condition of compulsory service by actual force, threat of force, or threats of legal coercion. *See* 22. U.S.C. §7102; *Bailey*, 219 U.S. at 243. As noted in *Muchira*, the test for determining whether an employer's conduct was sufficiently serious to constitute coercion contains both a subjective and objective element. 850 F.3d at 618. The factfinder must consider "the particular vulnerabilities of a person in the victim's position," and the victim's acquiescence to remaining employed must be "objectively reasonable under the circumstances." *Id*. (citing *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015)). Subjectively, Plaintiff was particularly vulnerable based upon the circumstances,

and objectively his decision to remain employed at AdSTM to avoid the harm threatened by Defendant was reasonable.

Mr. Guan trusted his sister to tell him the truth about the position he was being offered, the salary he would earn, and AdSTM's sponsorship of his work visa. Ms. Guan was aware of her brother's vulnerabilities, including psychological concerns, financial struggles, and his need to support his family. She used this knowledge to manipulate Mr. Guan's vulnerabilities; she used her role at AdSTM, to place Mr. Guan in a position where he was compelled to continue working for AdSTM to adequately support himself and his family. On top of Mr. Guan's job being dependent on remaining in the good graces of Ms. Guan, Mr. Ran, and AdSTM, Mr. Guan was also at the mercy of Ms. Guan when it came to his housing. Ms. Guan leased Mr. Guan housing for a rate of more than fifty percent of his net income and required that Mr. Guan conduct work for AdSTM from that location. Am. Compl. ¶¶ 34-35, 99-100; Ex. D to Am. Compl.

Mr. Guan had no choice but to continue working for AdSTM and to pay Mr. Ran every month. On multiple occasions, Ms. Guan threatened the consequences of not complying with her and Mr. Ran's demands, including, in Mr. Guan's interpretation, loss of employment and deportation. Contrary to Defendant's assertion, Mr. Guan was not free to seek alternate employment or leave the United States. Alice Guan's Mot. to Dismiss Am. Compl. at p. 6. AdSTM required Mr. Guan to enter into an overly-restrictive non-competition agreement, which prevented him from seeking employment elsewhere while employed by the company. Am. Compl. ¶¶ 81-85; *see also* Non-Competition Agreement, attached as Ex. F to Am. Comp. H-1B visas are only provided to individuals in "specialty occupations." 8 C.F.R. § 214.2(h)(1)(ii)(B). The non-competition agreement not only prevented Mr. Guan from gaining employment outside

of AdSTM for which an H-1B visa could be provided but also entitled AdSTM to injunctive relief if Mr. Guan even expressed an interest in sending a resume to a potential employer. Am. Compl. ¶ 85; Ex. D to Am. Compl.[3]

Mr. Guan was not free to simply leave his position at AdSTM or to stop paying Mr. Ran on a monthly basis. The consequences of either action would result in Mr. Guan's termination, inability to find alternate employment without subjecting himself to serious legal ramifications under the non-competition agreement, deportation of his family from the United States, and the potential loss of the home in which they resided. For these reasons, the allegations in Mr. Guan's Amended Complaint are sufficient to demonstrate that Mr. Guan was held to a condition of peonage by Ms. Guan in violation of the TVPA.

At the motion to dismiss phase, the Court must credit Plaintiff's factual allegations. Plaintiff has alleged facts sufficient to establish that all Defendants named in the Amended Complaint believed a debt existed (and indeed, that Ms. Guan played an integral hand in creating such a debt) and that they held Mr. Guan to a condition of involuntary servitude as a result. The Court should deny Ms. Guan's motion to dismiss on Count I.[4]

## II.    THIS COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS COUNT II OF PLAINTIFF'S AMENDED COMPLAINT, AS MR. GUAN HAS ALLEGED FACTS SUFFICIENT TO DEMONSTRATE MS. GUAN

---

[3] Any argument that Mr. Guan's non-competition agreement was limited to competitive employers ignores the practicalities of Mr. Guan's employment. As the holder of an H-1B visa, which is narrow by definition, nearly an employment to which he could apply could be considered competitive.

[4] Ms. Guan spends a substantial portion of her motion to dismiss discussing slavery and forced labor as an apparent red herring. Plaintiff not alleged violations of these sections, and Ms. Guan's focus on those issues is inappropriate. Even if such focus was relevant to the issues in the Amended Complaint, Ms. Guan simply ignores many of the facts alleged in the Amended Complaint, including those about Mr. Guan's restrictive non-competition agreement.

**BENEFITTED FINANCIALLY FROM PEONAGE, SLAVERY, AND/OR TRAFFICKING.**

The TVPA authorizes a civil claim against anyone who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of section 1581(a), 1592, or 1595(a), knowing or in reckless disregard of the fact that the venture has engaged in such violation." 18 U.S.C. § 1593A.

Despite requesting the Court dismiss this Claim, Ms. Guan does not assert that Mr. Guan failed to allege that Ms. Guan benefitted financially or otherwise through her participation in the activities described in the Amended Complaint. Ms. Guan similarly does not assert that Mr. Guan failed to allege Ms. Guan knew her participation in such activities constituted a violation of the TVPA.

Ms. Guan's only argument is that Plaintiff failed to properly allege a predicate offense. As discussed *supra*, Ms. Guan helped create the conditions under which Mr. Guan was held to a condition of peonage. As discussed *infra*, Ms. Guan also participated in trafficking Mr. Guan to the United States.

Ms. Guan negotiated for and executed a contract that required Mr. Guan to pay half of his net salary to Mr. Ran. Am. Compl. ¶ 25. Further, Ms. Guan personally benefitted financially from Mr. Guan's work at AdSTM, as well as through rental and utility payments she received from Mr. Guan. Am. Compl. ¶¶ 35-36. Ms. Guan promised Mr. Guan a salary between $70,000.00 and $80,000.00 annually, but knew that Mr. Guan would not receive the full value of that salary. *See Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 455 (E.D. Va. 2015). There is no argument that Mr. Guan has sufficiently pled facts demonstrating the financial benefit conferred upon Ms. Guan or her knowledge that such a benefit was derived from the peonage, slavery, and/or trafficking of Mr. Guan.

Because Mr. Guan has alleged facts sufficient to support the conclusion that Ms. benefitted financially from peonage, slavery, and/or trafficking of Mr. Guan, this Court should deny Ms. Guan's motion to dismiss on Count II.

**III.   THIS COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS COUNT III OF PLAINTIFF'S AMENDED COMPLAINT, AS MR. GUAN HAS ALLEGED FACTS SUFFICIENT TO DEMONSTRATE MS. GUAN TRAFFICKED MR. GUAN IN VIOLATION OF THE TVPA.**

The TVPA authorizes a civil claim against anyone who "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590(a). Ms. Guan does not contend that Plaintiff has failed to allege any of the facts specifically related to trafficking, but rather focuses its efforts entirely on whether Plaintiff alleged facts sufficient to demonstrate a violation of Section 1581, specifically, which Plaintiff addresses *supra*. Even beyond that, Plaintiff has alleged facts sufficient to establish a trafficking violation.

Liability for trafficking is a separate issue from liability for other portions of the TVPA. *Lagasan v. Al-Ghasel*, 92 F.Supp. 3d 445, 454 (E.D. Va. 2015) (citing *Shukla v. Sharma*, No. 07-cv-2972, 2012 U.S. Dist. LEXIS 18392, at *14 (E.D.N.Y. Feb. 14, 2012)). Liability can attach under Section 1590 to anyone who "knowingly… obtained by any means" a person whose labor violates federal anti-trafficking laws. 18 U.S.C. § 1590(a).

In *Lagasan*, this Court found the defendants liable for trafficking because they specifically recruited the plaintiff's services through an employment agency in the Philippines, transported her to Qatar, and fraudulently acquired a visa for her to travel to the United States to participate in forced labor or involuntary servitude.

In *Doe v. Howard*, this Court found the defendants liable for trafficking because they employed the plaintiff in Yemen, but induced the plaintiff to move with them to a foreign country. The defendants promised the plaintiff certain benefits, including a day off, health insurance, and a safe place to live, but then held her in involuntary servitude and forced labor without providing those benefits. 2012 U.S. Dist. LEXIS 125414 at *11 (E.D. Va. Sept. 4, 2012).

Similar to the defendants in *Lagasan* and *Doe*, Ms. Guan misrepresented the conditions under which Mr. Guan would be working. Ms. Guan specifically recruited Mr. Guan for a particular job. Am. Compl. ¶¶ 20-22.; Ex. B to Am. Compl. She promised him a certain salary despite knowing he would never receive the benefit of the stated salary. Ms. Guan, through the immigration lawyer, represented to the United States government that Mr. Guan's proposed wage rate would be equal to the prevailing wage rate, $51,168.00 per year, a figure much lower than what she had promised Mr. Guan. Am. Compl. ¶¶ 22, 29. Ms. Guan picked Mr. Guan up from the airport and transported him to a home she owned in Virginia. *Id*. at ¶ 33. Ms. Guan was integral to Mr. Guan's move to the United States, and because she withheld or misrepresented critical information, Mr. Guan was unaware of the conditions he would be subjected to once he arrived.

As alleged in the Amended Complaint, Ms. Guan took these actions in service of holding Mr. Guan in peonage, as discussed *supra*. As a result, the Court should deny Ms. Guan's motion to dismiss with respect to Count III.

IV. **THIS COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS COUNT IV OF PLAINTIFF'S AMENDED COMPLAINT, AS MR. GUAN HAS ALLEGED FACTS SUFFICIENT TO DEMONSTRATE HE IS ENTITLED TO AN EQUITABLE REMEDY THROUGH A CLAIM OF UNJUST ENRICHMENT AGAINST MS. GUAN.**

Ms. Guan misstates the law with respect to unjust enrichment. Although Ms. Guan gives an accurate historical account of the creation of common law unjust enrichment, she inaccurately argues that Mr. Guan would have needed to send payments to Ms. Guan that she was not entitled to for Mr. Guan to recover.

In Virginia, plaintiffs must establish three elements to state a cause of action for unjust enrichment: "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *R.M. Harrison Mech. Corp. v. Decker Indus., Inc.,* 75 Va. Cir. 404, 407 (Va. Cir. Ct. 2008) (citing *Centex Constr. V. Acstar Ins. Co.*, 448 F. Supp. 2d 697, 707 (E.D. Va. 2006)).

In the instant case, Ms. Guan negotiated for the benefit of Mr. Guan's labor in the PSA and its amendments, a substantial increase in her salary, and the benefit to her of approximately $2.5 million dollars. Am. Compl. ¶ 68. These monetary benefits were the result of Mr. Guan's labor and payments to Mr. Ran. Ms. Guan knew that Mr. Guan was conferring a benefit, as she bargained for the benefit. Given the totality of the circumstances, and because of the substantial benefit Ms. Guan received as a result of Mr. Guan's work and payments, it is inequitable for Ms. Guan not to pay for the value of Mr. Guan's work and payments.

Because Mr. Guan has alleged facts sufficient to support a reasonable inference that he is entitled to an equitable remedy from Ms. Guan, this Court should deny Ms. Guan's motion to dismiss Count IV of his Amended Complaint.

## V.   PLAINTIFF REQUESTS LEAVE TO AMEND IF THE COURT FINDS DEFICIENCIES IN THE COMPLAINT.

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires. '[T]his mandate is to be heeded.'" *Foman v. Davis*, 371 U.S. 178, 182, (1962). There are limited circumstances under which leave to amend should be denied. The Fourth Circuit has held that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber v. Harvey,* 438 F.4d 404, 426 (4th Cir. 2006) (quoting *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 509 (4th Cir. 1986)).

The discussion above demonstrates that Plaintiff's allegations as set forth in the Amended Complaint state plausible claims for relief under *Iqbal* and *Twombly* and, as such, Plaintiff is not acting in bad faith. If the Court determines that the Amended Complaint is insufficiently pled, Plaintiff requests leave to amend his Amended Complaint to provide further specificity as to any particulars of his claims. Such amendment would not be futile, and would be in the interests of justice without causing prejudice to Defendant.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Defendant's Motion to Dismiss as to Count I, II, III, and IV of Plaintiff's Amended Complaint against Alice Guan and allow Plaintiff to proceed with these claims. If the Court finds deficiencies in Plaintiff's pleading, Plaintiff respectfully requests the Court grant him leave to amend his Complaint.


Dated:        June 6, 2017                    Respectfully,


                                              _____/s/_____
                                              Joshua Erlich, VA Bar No. 81298
                                              Davia Craumer, VA Bar No. 87426
                                              Katherine Herrmann, VA Bar No. 83203

THE ERLICH LAW OFFICE, PLLC
2111 Wilson Blvd., Ste. 700
Arlington, VA  22201
Tel:     (703) 791-9087
Fax:     (703) 722-8114
Email: jerlich@erlichlawoffice.com
           dcraumer@erlichlawoffice.com
           kherrmann@erlichlawoffice.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2017, a true copy of the foregoing was filed electronically with the Clerk of the Court and served electronically using the CM/ECF upon:

> Douglas E. Bywater (VSB No. 9137)
> James R. Tate (VSB No. 6241)
> Paul Mickelsen (VSB No. 71274)
> Travis D. Tull (VSB No. 47486)
> Tate Bywater Fuller Mickelsen & Tull, PLC
> 2740 Chain Bridge Road
> Vienna, VA 22181
> debywater@tatebywater.com
> jtate@tatebywater.com
> pmickelsen@tatebywater.com
> ttull@tatebywater.com
>
> *Counsel for Defendant Alice Guan*
>
> James B. Kinsel (VSB No. 44247)
> Rebecca Bricken Segal (VSB No. 73403)
> PROTORAE LAW, PLLC
> 1921 Gallows Road, Suite 950
> Tysons, VA, 22182
> jkinsel@protoraelaw.com
> rsegal@protoraelaw.com
>
> *Counsel for Defendant Advanced Systems
> Technology & Management, Inc.*
>
> Mihir V. Elchuri (VSB No. 86582)
> HIRSCHLER FLEISHER,
> A PROFESSIONAL CORPORATION
> 8270 Greensboro Drive, Suite 700
> Tysons, VA 22102
> melchuri@hf-law.com
>
> *Counsel for Defendant Qi Tech, LLC*
>
> William B. Cummings, Esq. (VSB No. 6469)
> William B. Cummings, P.C.
> Post Office Box 1177
> Alexandria, VA 22313
> wbcpclaw@aol.com
>
> *Counsel for Bing Ran*

_____/s/_____
Joshua Erlich, VA Bar No. 81298
Davia Craumer, VA Bar No. 87426
Katherine Herrmann, VA Bar No. 83203
The Erlich Law Office, PLLC
2111 Wilson Blvd.
Suite 700
Arlington, VA  22201
Tel:    (703) 791-9087
Fax:    (703) 351-9292
Email:  jerlich@erlichlawoffice.com
        dcraumer@erlichlawoffice.com
        kherrmann@erlichlawoffice.com

*Counsel for Plaintiff Fei Guan*