**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| FEI GUAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:17-cv-00332 (JCC/IDD) |
| BING RAN; ALICE GUAN; | ) |
| ADVANCED SYSTEMS MANAGEMENT | ) |
| AND TECHNOLOGY, INC.; and | ) |
| QI TECH, LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT ADVANCED SYSTEMS MANAGEMENT AND TECHNOLOGY, INC.'S
MOTION TO DISMISS AMENDED COMPLAINT**

Plaintiff Fei Guan ("Plaintiff" or "Mr. Guan"), by counsel, for his Memorandum in

Opposition to Defendant Advanced Systems Management and Technology, Inc.'s ("AdSTM")

Motion to Dismiss his Amended Complaint, states as follows:

## INTRODUCTION

Plaintiff's Amended Complaint asserts three claims against AdSTM under the

Trafficking Victims Protection Act of 2000, as amended and reauthorized ("TVPA"): (1) Count

I, peonage; (2) Count II, benefitting financially from peonage, slavery, and trafficking in

persons; and (3) Count III, trafficking in persons. In addition, Count V of Plaintiff's Amended

Complaint includes a request for declaratory relief related to the non-competition agreement

between Plaintiff and AdSTM.

Plaintiff has pled facts in Counts I, II, and III that sufficiently allege Defendant's

violations of the TVPA, and, contrary to Defendant's assertions, Count V of Plaintiff's Amended

1

Complaint sets forth a justiciable case or controversy for which declaratory relief may be sought. Plaintiff should be permitted to proceed on all four counts against Defendant.

## STATEMENT OF FACTS

In 1985, Mr. Ran and Ms. Guan married. Am. Compl. ¶¶ 3-4. In 1996, Ms. Guan formed AdSTM, a Virginia corporation, as its sole owner; Mr. Ran began assisting with AdSTM's operation in 2000. Am. Compl. ¶¶ 16-17. Mr. Ran and Ms. Guan separated in 2006, entering into a Parenting, Support, and Property Settlement Agreement ("PSA") shortly thereafter. Am. Compl. ¶ 45.

In early 2008, while Mr. Guan was still living in Japan, Ms. Guan offered Mr. Guan a position at AdSTM for a salary of approximately $70,000 or $80,000 per year. Am. Compl. ¶¶ 20-22. Mr. Guan accepted the offer of employment pursuant to these terms. Am. Compl. ¶ 24. Ms. Guan hired an attorney to complete Mr. Guan's paperwork for his H-1B work visa. Am. Compl. ¶ 28. On the visa paperwork, AdSTM represented that Mr. Guan's proposed wage rate would be equal to the prevailing wage rate, $51,168.00 per year. Am. Compl. ¶ 29. Ms. Guan also arranged for Mr. Guan to lease a home she owned. Am. Compl. ¶ 30. Mr. Guan, on an H-1B visa, and his wife and child, on H4 visas, arrived in the United States at the end of September 2008. Am. Compl. ¶¶ 31-32.

In June 2008, Ms. Guan and Mr. Ran negotiated an amendment to the PSA ("June 2008 Amendment") that provided for Mr. Guan and Yu Guan's employment as follows:

> As long as AdSTM has revenue of not less than $3M/year, Bing Ran and AdSTM shall employ Yu Guan and Fei Guan continuously for 5 years (for Yu Guan: starting from July 1, 2008. For Fei Guan: starting October 1, 2008), and proactively sponsor their H-1 and Green Card processes. Each of their salary will be $75K/year. Each of them will give Bing Ran half of their net income from AdSTM. If they purposely do not pay Bing on a monthly basis and even refuse to pay Bing after Bing's reminder,

> then Bing and AdSTM have no obligation to pay and hire them.
> Yue Guan agrees not to compete with AdSTM in any way during
> this 5-year period and this commitment will not expire even if Yu
> and Fei Guan breach the contract.

Am. Compl. ¶ 51. Ms. Guan and Mr. Ran did not inform Mr. Guan of the terms of the June 2008

Amendment or the effect it would have on his employment prior to his arrival in the United

States. Am. Compl. ¶ 52.

After Mr. Guan moved to the United States, but before he began working, Ms. Guan

informed Mr. Guan he would be required to pay one half of his AdSTM net income to Mr. Ran

every month. Am. Compl. ¶ 70. If Mr. Guan failed to make such payments, his employment

would be terminated and he would have to leave the United States because he was here on an H-

1B visa. Am. Compl. ¶ 71. Under threat of losing his job and his immigration status, Mr. Guan

had no choice but to agree to pay. Am. Compl. ¶ 74. Mr. Guan began working for AdSTM,

under the direct supervision of Ms. Guan. Am. Compl. ¶¶ 94-95.

In October 2008, Ms. Guan and Mr. Ran negotiated another amendment to the PSA

("October 2008 Amendment") that altered the terms of Mr. Guan and Yu Guan's employment as

follows:

> As long as AdSTM has annual revenue of not less that $3 million
> dollars/year, Yu Guan will be employed until 2/1/2011, and Fei
> Guan will be employed until 10/14/2011. Fei Guan's salary will be
> $75,000/year and Yu Guan's salary will be $90,000/year starting
> 10/16/2008. Each of them will give Bing Ran half of their net
> incomes from AdSTM (except Yu Guan can keep his income for
> the period of 7/1/2008 to 10/15/2008). If they do not pay Bing on a
> monthly basis and still do not pay Bing after Bing's reminder, then
> their employments with AdSTM shall be terminated. However, if
> they work on projects later and their hours are charged to the
> government as direct labors, then they shall not pay Bing for any
> those incomes. After AdSTM's annual revenue drops below $3
> million dollars/year, Yu Guan and Fei Guan will be continually
> hired by AdSTM without pays and they will pay their insurances

3

through AdSTM plan.

Am. Compl. ¶ 58. The October 2008 Amendment also required AdSTM to support Mr. Guan's

H1 visa and green card. Am. Compl. ¶ 59. Ms. Guan and Mr. Ran did not inform Mr. Guan of

the terms of the October 2008 Amendment. Am. Compl. ¶ 60.

      Also in October 2008, Ms. Guan required Mr. Guan to sign an "Employee Proprietary

Information and Non-Compete Agreement" ("Non-Compete"), which prevented him from

discussing his compensation than anyone other than his immediate supervisor or higher-level

officers at AdSTM. Am. Compl. ¶ 39. The Non-Compete also laid out several other critical

provisions:

> In the event of a breach or threatened breach by Employee of any
> of the provisions of this Agreement, Employee agrees that
> Employer – in addition to and not in limitation of any other rights,
> remedies, or damages available to Employer at law or in equity –
> shall be entitled to a permanent injunction in order to prevent or
> restrain any such breach by Employee or by Employee's partners,
> agents, representatives, servants, employees, and/or any and all
> persons directly or indirectly acting for or with Employee.

Am. Compl. ¶ 40.

> Employee also agrees that for 2 (two) years after Employee is no
> longer employed by the ASTM, INC., Employee will not directly
> or indirectly solicit, agree to perform, or perform services of any
> type that ASTM, INC. can render ("Services") for any person or
> entity who paid or engaged ASTM, INC. for Services, and with
> whom Employee had any dealing while employed by ASTM, INC.
> This restriction also applies to assisting any employer or third
> party.

Am. Compl. ¶ 41.

> Employee agrees that during the term of his employment with
> ASTM, INC. he or she shall not submit his or her resume to any
> prospective employer (including consent to the use of his or her
> name in a proposal) who is competing against ASTM, INC. for the
> products and services sold by ASTM, INC.

Am. Compl. ¶ 42. In October 2008, under penalty of losing his new employment and immigration status, began making payments to Mr. Ran. Am. Compl. ¶ 97. As a result of the Non-Compete and the terms of his H-1B visa, Mr. Guan was unable to work with an alternate employer. Am. Compl. ¶ 85.

Mr. Guan sent checks to Mr. Ran's home address every month until August 2014. Am. Compl. ¶ 118. On one occasion in 2011, Mr. Guan did not mail a check to Mr. Ran immediately upon receiving his paycheck because Mr. Ran was in China. Am. Compl. ¶ 112. Ms. Guan called Mr. Guan to ask why he had not mailed the check, and told Mr. Guan he would have trouble from Mr. Ran if he did not pay. Am. Compl. ¶¶ 113-114. Mr. Guan interpreted her statements to mean that he would lose his job if he did not pay immediately. Am. Compl. ¶ 115. At that time, Mr. Guan was still in the United States on an H-1B visa, and Mr. Guan knew if he was terminated, he and his family would have to leave the United States. Am. Compl. ¶¶ 116-117.

In October 2010, Mr. Ran became Mr. Guan's immediate supervisor. Am. Compl. ¶ 130. At Mr. Ran's direction, Mr. Guan began performing work, purchasing computers and other supplies, for Qi Tech, a separate business entity that Mr. Ran controlled. Am. Compl. ¶ 134; Am. Compl. ¶ 150. During the same time period, Mr. Guan began receiving bonuses from Mr. Ran through AdSTM. Am. Compl. ¶ 131. In late 2011, Mr. Guan received one bonus check from Mr. Ran through Qi Tech and received reimbursements purchasing Qi Tech supplies, but did not otherwise receive compensation from Qi Tech. Am. Compl. ¶ 152; Am. Compl. ¶ 155. Toward the end of 2011, Esther Purushotham ("Ms. Purushotham"), an accountant at AdSTM who also performed accounting services for Qi Tech, informed Mr. Guan that he should not be receiving compensation in the form of bonuses from Qi Tech because he was not an employee of Qi Tech. Am. Compl. ¶ 140. In October 2013, Mr. Guan requested that he stop receiving bonuses from

5

Mr. Ran, and in exchange he would no longer be required to pay one half his net salary to Mr. Ran. Am. Compl. ¶ 138. Mr. Ran denied Mr. Guan's request and continued to demand monthly payments. Am. Compl. ¶ 139. In total, Mr. Guan received approximately $79,000.00 in bonuses after taxes. Am. Compl. ¶ 144.

In November 2014, Mr. Ran approached Mr. Guan and requested that he sign a legal agreement saying the monthly payments Mr. Guan made had been a "personal loan." Am. Compl. ¶ 123. Mr. Ran had never previously described the payments as a loan. Am. Compl. ¶ 124. The June 2008 Amendment and October 2008 Amendment did not describe the payments as a loan. Am. Compl. ¶ 126. Mr. Guan never signed an agreement saying the payments were a loan. Am. Compl. ¶ 129.

In total, Mr. Guan paid Mr. Ran approximately $160,000.00 of the net income Mr. Guan earned at AdSTM. Am. Compl. ¶ 119. In total, Mr. Guan paid Ms. Guan nearly $60,000.00 in rent, not including utilities, of the net income Mr. Guan earned at AdSTM. Am. Compl. ¶ 120.

## ARGUMENT

### Rule 12(b) Standard

Rule 8 of the Federal Rules of Civil Procedure provides that "a pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of the claims, or the applicability of defenses." *Presely v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). Instead, at the pleading

stage, a court assumes the truth of all facts alleged in the complaint and must construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

More recently, the Supreme Court has explained that, to survive a motion to dismiss, a complaint must contain factual information to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint can withstand a motion to dismiss "even if it appears 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Finally, in *Aschcroft v. Iqbal*, 556 U.S. 662, 663 (2009), the Supreme Court further explained that to achieve facial plausibility, a complaint should contain sufficient factual allegations to support a reasonable inference that defendant is liable for the misconduct alleged. *See id*. at 663.

## I.     THIS COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS COUNTS I, II, AND III OF PLAINTIFF'S AMENDMENT COMPLAINT AGAINST DEFENDANT BECAUSEMR. GUAN HAS PROPERLY PLED THAT AdSTM ACTED KNOWINGLY AND WILLFULLY.

Plaintiff must show that AdSTM knowingly and willfully violated the TVPA[1]. The facts alleged in Plaintiff's Amended Complaint are sufficient to demonstrate that Defendant knowingly and willfully held Plaintiff in involuntary servitude to satisfy a debt, benefitted financially from the involuntary servitude of Plaintiff, and trafficked Mr. Guan to the United States to obtain his involuntary labor. Plaintiff has alleged two separate bases evidencing that

---

[1] The "scienter" requirement cited by Defendant applies to forced labor claims under 18 U.S.C. 1589, but it does not apply to claims of involuntary servitude or peonage under the TVPA under 18 U.S.C. 1581. AdSTM's Mot. to Dismiss at p. 11 (citing *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011). For this reason, this alleged requirement is not addressed in this memorandum in opposition.

AdSTM knowingly and willfully acted in violation of the TVPA: direct involvement in the violations and imputed knowledge from its agents.

**A. Plaintiff Has Alleged Facts Sufficient to Demonstrate AdSTM's Direct Involvement in Holding Mr. Guan to Peonage.**

Defendant argues that the Court should dismiss Plaintiff's TVPA claims found in the Amended Complaint on the grounds that Defendant did not knowingly and/or willfully coerce Mr. Guan to compel him to remain employed at AdSTM. AdSTM's Mot. to Dismiss at p. 11. AdSTM, however, was directly involved in holding Mr. Guan to peonage.

As a condition of his employment, AdSTM required Mr. Guan to enter into an overly-restrictive non-competition agreement, which prevented him from seeking employment elsewhere while employed by the company. Am. Compl. ¶¶ 81-85; *see also* Non-Competition Agreement, attached as Ex. F to Am. Comp. H-1B visas are only provided to individuals in "specialty occupations." 8 C.F.R. § 214.2(h)(1)(ii)(B). As alleged in Plaintiff's Amended Complaint, the limitations upon Mr. Guan under the non-competition agreement not only prevented Mr. Guan from gaining employment outside of AdSTM for which an H-1B visa could be provided but also prevented him from even sending a resume to a potential employer. Am. Compl. ¶ 85; Ex. F. to Am. Compl. Moreover, AdSTM failed to adhere the law in securing and maintaining Mr. Guan's H-1B visa, and chose to selectively enforce the consequences of Mr. Guan's visa status without providing him with the protections provided by the same "immigration rules" cited by Defendant.[2]

---

[2] The Labor Condition Application ("LCA") completed by AdSTM did not account for the wages that Mr. Guan was required to pay to Mr. Ran and did not account for the fact that Mr. Guan would be required to pay rent for the location from which he worked.

AdSTM failed not only to notify Mr. Guan of these conditions of his employment prior to his arrival in the United States, but also failed to notify the Department of Homeland Security of the

**B.** **Because of AdSTM's direct involvement in holding Mr. Guan to peonage, Defendant's argument that it did not participate knowingly or willingly in holding him to peonage is unsustainable. Plaintiff Has Alleged Facts Sufficient to Demonstrate AdSTM's Involvement in the Trafficking of Mr. Guan.**

Defendant's contention that Ms. Guan acted alone and in her individual capacity in holding Mr. Guan in peonage is contrary to the facts set forth in Plaintiff's Amended Complaint. Ms. Guan worked as an agent of AdSTM at the time she offered Mr. Guan a position at AdSTM and negotiated his salary. Further, Ms. Guan signed Mr. Guan's H-1B visa paperwork on behalf of AdSTM.

In *Lagasan v. Al-Ghasel*, recruitment via a third party is sufficient to establish trafficking liability for employer defendants. 92 F.Supp. 3d 445 (E.D. Va. 2015). Plaintiff has sufficiently pled facts to demonstrate AdSTM knowingly coordinated with Ms. Guan in recruiting and hiring Mr. Guan, as Mr. Guan came to the United States specifically to take the position at AdSTM. Because AdSTM was directly involved in trafficking Mr. Guan to the United States, whether or not Ms. Guan's knowledge is imputable to the company is irrelevant.

Even if AdSTM had no communication with Mr. Guan prior to his arrival, the fact that Mr. Guan's employment was arranged at AdSTM is sufficient for Mr. Guan's Amended Complaint to survive a Motion to Dismiss under 18 U.S.C. 1590(a). When an individual's employment has been arranged, this Court does not require direct contact between that employer and the prospective employee to find that trafficking may have occurred. *Baxla v. Chaudhri*, 2016 U.S. Dist. LEXIS 177038, *8-10 (E.D. Va 2016).

---

underlying conditions of Mr. Guan's employment as required by law. 8 C.F.R. § 214.2(h)(2)(i)(E).

If a visa-holder ceases to work for the sponsoring employer, the sponsoring employer must notify the government to cancel the visa, or have the visa transferred to a different employer. *Id.* 214.2(h)(2)(i)(D).

**C. Plaintiff Has Alleged Facts Sufficient to Demonstrate that the Knowledge of Ms. Guan and Mr. Ran Can be Imputed to AdSTM, as Ms. Guan and Mr. Ran Operated as Sole Actors for the Company.**

Even if AdSTM's direct involvement in trafficking Mr. Guan is insufficient to establish it was knowingly involved in the matters alleged in the Complaint, Ms. Guan and Mr. Ran's knowledge can be imputed to AdSTM due to the agency-principal relationship between Ms. Guan, Mr. Ran, and Defendant.

Ordinarily, the knowledge of an agent may be imputed to the principal. *See, e.g.*, *Fulwiler v. Peters*, 179 Va. 769, 776 (1942). Contrary to Defendant's argument, the adverse interest exception to this general rule does not apply to the matter at hand. AdSTM's Mot. to Dismiss at p. 12 (citing *In re Derivium Capital, LLC*, 716 F.3d 355, 367-68 (4th Cir. 2013); *Allen Realty Corp v. Holbert*, 227 Va. 441, 446 (1984)).

As noted in *In re Derivium*, "if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests." 716 F.3d at 368 (quoting *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 359 (3d Cir. 2001)). The sole actor rule thus operates as a limitation on the adverse interest exception when an agent is the principal's sole representative. *Id*. A sole agent need not be a single individual, but rather can be comprised of any controlling party, if there is no one to whom they "can impart [their] knowledge, or from whom [they] can conceal it." *R.F. Lafferty*, 267 F.3d at 359. In such

instances, "the corporation must bear the responsibility for allowing an agent to act without accountability." *Id.*[3]

As noted in *R.F. Lafferty*, the sole actor exception "has been applied to cases in which the agent . . . was also the sole shareholder of the corporation." 267 F.3d at 359-60 (citing *In re Mediators*, 105 F.3d at 827). Courts have also applied the sole actor exception in cases when an agent is found to have "dominated" the corporation. *Id.* at 360 (citing *PNC Bank v. Hous. Mortgage Corp.*, 899 F. Supp. 1399, 1405-06 (W.D. Pa. 1994)).

Ms. Guan and Mr. Ran were owners and corporate officers of AdSTM. Am. Compl. ¶ 6-7. Mr. Ran was in substantial control of the business, entering agreement with other companies, such as Qi Tech. Ms. Guan, as President and CEO of AdSTM, sent Plaintiff the offer letter for a position at AdSTM. Ex. B. to Am. Compl. Paragraph 9(a) of the PSA, included in Defendant's Exhibit 2 to its Motion to Dismiss, cites Ms. Guan as the "sole shareholder in Advanced Systems Technology and Management, Inc." [4] Ms. Guan and Mr. Ran had personal knowledge of all of the allegations in the complaint and, because of their level of control over the business, they had no one from whom to conceal their knowledge. AdSTM must bear responsibility for their actions.

---

[3] *See e.g. In re Derivium*, 716 F.3d at 368 (holding that three owners of the defendant company were "sole actors" of the company and therefore the adverse interest exception did not apply). *See also R.F. Lafferty*, 267 F.3d at 360 (holding that multiple family members "dominated" control of the companies at issue, and therefore were sole actors of the companies to whom the adverse interest exception did not apply).

[4] Paragraph 9(j) of the PSA contemplates Mr. Ran becoming the majority shareholder of AdSTM after July 5, 2008. The Agreement states that "[Mr. Ran] agrees in his capacity of CEO and majority shareholder of AdSTM to make certain that this agreement is promptly carried out." Regardless of whether Ms. Guan or Mr. Ran were in control of the company, the knowledge of both individuals may be imputed to Defendant under the sole actor rule.

Plaintiff has sufficiently alleged that AdSTM knowingly participated in the trafficking of

Mr. Guan. Ms. Guan and Mr. Ran's knowledge, as agents of AdSTM, is imputed to AdSTM, the

principal, as Plaintiff has pled facts sufficient to demonstrate that Ms. Guan and Mr. Ran acted as

the sole representatives of the company. For these reasons, Plaintiff's has sufficiently alleged the

knowledge required to find liability against the Defendant under Counts I, II, and III of the

Amended Complaint, and these claims should not be dismissed.

II.     **THIS COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS COUNT
        III OF PLAINTIFF'S AMENDED COMPLAINT BECAUSE MR. GUAN HAS
        PLED FACTS SUFFICIENT TO DEMONSTRATE THAT AdSTM RECRUITED,
        HARBORED, AND TRANSPORTED HIM IN VIOLATION OF SECTION 1590
        OF THE TVPA.**

The TVPA authorizes a civil claim against anyone who "knowingly recruits, harbors,

transports, provides, or obtains by any means, any person for labor or services in violation of this

chapter." 18 U.S.C. § 1590(a). Here, Plaintiff's Amended Complaint contains factual allegations

as to Defendant's "recruit[ing]," "harbor[ing]," and "transport[ing]" Mr. Guan.

A.  **Plaintiff has Pled Facts Sufficient to Demonstrate that AdSTM Recruited and
    Transported Mr. Guan in Violation of the TVPA.**

Ms. Guan, acting as an agent of AdSTM, recruited Mr. Guan while he was living in Japan

for a position at AdSTM in the United States. Am. Compl. ¶¶ 20-21. Ms. Guan informed Mr.

Guan that AdSTM would pay him a salary of $70,000.00 to $80,000.00 per year. *Id*. at ¶ 22.

AdSTM appears as the name of the employer for whom Plaintiff was to work in the United

States in accordance with his H-1B visa. *Id.* at ¶ 29. While it is true that Ms. Guan conducted all

discussions leading up to Plaintiff's decision to come to the United States, she did so on behalf of

and as the sole representative of AdSTM. Ms. Guan could not have recruited Mr. Guan to come

to the United States had it not been for the promise of a position with the company.

Defendant's contention that Ms. Guan hired an immigration attorney to represent Plaintiff is incorrect. AdSTM's Mot. to Dismiss at p. 14 (citing Am. Compl. ¶ 28). Ms. Guan hired an immigration attorney to represent AdSTM and assist the company with the completion of Mr. Guan's immigration paperwork and H-1B visa documents. Am. Compl. ¶ 28. AdSTM reviewed and submitted Mr. Guan's H-1B visa documents to the United States Department of Homeland Security to permit Mr. Guan to immigrate to the United States for the express purpose of working for AdSTM. *Id*.

AdSTM, Ms. Guan, and Mr. Ran coordinated to recruit and transport Mr. Guan to the United States; as a result, Plaintiff has stated a viable claim of trafficking against Defendant.

**B.  Plaintiff Has Alleged Facts Sufficient to Demonstrate that AdSTM Harbored Mr. Guan in Violation of the TVPA.**

Defendant contends that Ms. Guan arranged for Mr. Guan's housing, and therefore Ms. Guan alone "harbored" Mr. Guan in violation of the TVPA. AdSTM's Mot. to Dismiss at p. 14. This argument once again fails to acknowledge Defendant's role in coordinating with Ms. Guan, the sole representative of AdSTM, in these actions.

Ms. Guan picked Mr. Guan and his family up from the airport and transported them to the location where Mr. Guan would be both living and working for AdSTM. Am. Compl. ¶¶ 33-34. For the first two years of Mr. Guan's employment with AdSTM, Mr. Guan worked almost entirely from home. *Id.* at ¶ 95. Ms. Guan told Mr. Guan the reason he needed to work from home was because Mr. Ran, who had at that time become the Chief Executive Officer of AdSTM, did not want to see him. *Id.* at ¶ 100. This fact, in itself, is sufficient to satisfy the notice pleading requirements for a trafficking claim on the basis of "harboring." *See Franco v. Diaz*, 51 F. Supp. 3d 235, 247 (E.D.N.Y 2014) (declining to dismiss trafficking claim where plaintiff alleged that defendants, among other things, "provid[ed] her with housing after her arrival.").

As Plaintiff has adequately pled facts sufficient to demonstrate that Defendant coordinated with Ms. Guan in not only harboring, but also recruiting and transporting Mr. Guan to the United States, this claim against Defendant should not be dismissed.

**III.    THIS COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS COUNT I OF PLAINTIFF'S AMENDED COMPLAINT BECAUSE MR. GUAN HAS SUFFICIENTLY PLED THAT DEBT WAS TIED TO THE CONDITION OF INVOLUNTARY SERVITUDE TO WHICH HE WAS HELD BY AdSTM.**

Plaintiff has sufficiently pled facts in support of his claims against Defendant for (1) peonage, in violation of Section 1581; (2) benefitting financially from peonage, slavery, and trafficking in persons in violation of Section 1593; and (3) trafficking in persons in violation of Section 1590 of the TVPA. Section 1595 of the TVPA provides for a private right of action for all three claims. 18 U.S.C. § 1595 (2003).

**A.  Plaintiff Has Alleged Facts Sufficient to Demonstrate He Was Held to Peonage by AdSTM.**

Section 1581 makes it unlawful to hold a person to a condition of peonage. 18. U.S.C. § 1581. Peonage is "compulsory service in payment of a debt." *United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009) (quoting *Bailey v. Alabama*, 219 U.S. 219, 242 (1911)). Compulsory service is the equivalent of involuntary servitude, defined by the Supreme Court as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Bailey* 219 U.S. at 243.

1.  *The Allegations in Plaintiff's Amended Complaint Adequately Describe the Existence of a Debt.*

14

The circumstances surrounding payments from Plaintiff to Mr. Ran support the reasonable inference that these payments were both characterized by AdSTM and perceived by Mr. Guan as a debt and that Mr. Guan was obligated to remain employed at AdSTM in order to pay it. After his arrival in the United States, Ms. Guan informed Mr. Guan that he was required to pay half of his salary to Mr. Ran based upon an agreement between Ms. Guan and Mr. Ran. His sister went on to inform him that his failure to do so would result in termination of his employment and deportation of himself and his family from the United States. Am. Compl. ¶¶ 71-72. As a result, there was a direct connection, both objectively and subjectively, between Mr. Guan's employment at AdSTM and payments to Mr. Ran.

Mr. Guan believed he had no choice but to make the payments, equal to half of the net salary he received from AdSTM, to Mr. Ran from October of 2008 until August of 2014. Am. Compl. ¶¶ 97, 118. Mr. Guan received threats, but no benefit, from AdSTM in exchange for these payments. The only reasonable inference that can be drawn from these facts is that Mr. Guan believed himself to be indebted to Defendant, as he repeatedly surrendered half of the salary he received from AdSTM without receiving any benefit in exchange.

The facts alleged in Mr. Guan's Amended Complaint further demonstrate that AdSTM, through Mr. Ran and Ms. Guan, characterized these payments as the payment of a debt. As stated in Paragraph 10 of the October 2008 Amendment to the PSA, Mr. Ran agreed to hire Mr. Guan and promised that AdSTM would support Mr. Guan's "H1 and Green card visas," in exchange for Mr. Guan's provision to Mr. Ran of half of his net income from AdSTM. Am. Compl. ¶ 58. By the time Mr. Guan arrived in the United States, he had unknowingly and unwillingly accepted the benefit conferred upon him by this agreement, as he had already been hired by AdSTM and AdSTM had already sponsored his work visa. As a result of the agreement between Mr. Ran and

Ms. Guan, Mr. Guan became obligated to pay Mr. Ran prior to his first day of employment by AdSTM in October 2008.

The fact that Mr. Guan was obligated to continue work at AdSTM to pay off this debt is evidenced by the remainder of Paragraph 10 of the agreement. Am. Compl. ¶ 58; Ex. C. to Am. Compl. The last sentence of Paragraph 10 required, in the event that AdSTM's annual revenue dropped below three million dollars per year, that Mr. Guan would "be continually hired by AdSTM without pays and . . . pay [his] insurances through AdSTM plan." *Id*. Based on these facts, and construed in the light most favorable to the Plaintiff, Mr. Guan has sufficiently alleged facts demonstrating the existence of a debt that was tied to his involuntary servitude by Defendant.

> 2. *The Allegations in Plaintiff's Amended Complaint Are Sufficient to Demonstrate Mr. Guan was Compelled to Work at AdSTM by Threats of Legal Coercion.*

Because peonage is defined with reference to compulsory service and involuntary servitude, this Court should look to Section 1584 to evaluate whether Plaintiff has adequately pled violations of Section 1581. Under Section 1584, a defendant is liable for holding an individual to a condition of involuntary servitude if the defendant knowingly and willfully compels that individual to remained employed using actual force, threats of force, or threats of legal coercion. *See* 22. U.S.C. § 7102; *Bailey*, 219 U.S. at 243. As this Court noted in *Muchira v. Al-Rawaf*, the test for determining whether an employer's conduct was sufficiently serious to constitute coercion contains both a subjective and objective element. 850 F.3d 605, 618 (4th Cir. 2017). The factfinder must consider "the particular vulnerabilities of a person in the victim's position," and the victim's acquiescence to remaining employed must be "objectively reasonable under the circumstances." *Id*. (citing *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir.

2015)). Subjectively, Plaintiff was particularly vulnerable based upon the circumstances, and objectively, his decision to remain employed at AdSTM to avoid the harm threatened by Defendant was reasonable.

Defendant cites to *Muchira* in support of its contention that "the critical inquiry for the purposes of the TVPA is whether a person provides those services free from a defendant's physical or psychological coercion that as a practical matter eliminates the ability to exercise free will of choice." AdSTM's Mot. to Dismiss at p. 8 (citing *Muchira v. Al-Rawaf* 1:14-cv-770, U.S. Dist. LEXIS 49806 at **30-31(E.D. Va. 2014) (internal citation omitted), *aff'd* 850 F.3d 605 (4th Cir. 2017)). That language refers to the requirements necessary for a finding of a "forced labor" violation under Section 1589, not a finding of "involuntary servitude" under Section 1584 as alleged in Mr. Guan's Amended Complaint. For this reason, Defendant errs in its conclusion that "The conduct alleged by Plaintiff simply falls outside the type of conduct the Act was enacted to prevent." AdSTM's Mot. to Dismiss at p. 8.[5]

---

[5] This assertion is both false and contrary to the reality of modern human trafficking. Human trafficking among H-1B visa holders in the technology industry is a substantial and serious problem. *See e.g.*, Matt Smith, Jennifer Gollan and Adithya Sambamurthy, *Job brokers steal wages and entrap Indian tech workers in US*, The Guardian (October 28, 2014), available at https://www.theguardian.com/us-news/2014/oct/28/-sp-jobs-brokers-entrap-indian-tech-workers.

According to a report issued by the Polaris Project, the National Human Trafficking Reporting Center received fifty-two (52) reports regarding human trafficking individuals holding H-1B visas between August 1, 2014 and July 31, 2015, even though H-1B visa holders make up less than six percent of the total non-immigrant visa holding population. Polaris Project, *Labor Trafficking in the U.S.: A Closer Look at Temporary Work Visas* (2015), retrieved from www.polarisproject.org.

The Department of Justice has been active in investigating and prosecuting human trafficking that arises from the abuse of H-1B visas. *See e.g.*, Department of Justice, "*Highlands Ranch Man Found Guilty of Human Trafficking and Other Offenses*," news release, (July 1, 2013), available at https://www.justice.gov/usao-co/pr/highlands-ranch-man-found-guilty-human-trafficking-and-other-offenses (last visited June 2, 2017).

Mr. Guan learned of the position at AdSTM from a person whom he inherently trusted, his sister. Am Comp. ¶ 20. Mr. Guan relied on his sister's statements, made on behalf of AdSTM, about the salary he would receive in his visa-sponsored position at AdSTM. Am. Compl. ¶ 22. Ms. Guan sent Mr. Guan an offer letter, attached to the Amended Complaint as Exhibit B, in which the space provided for his salary was left blank. Ex. B. to Am. Compl. Ms. Guan signed this letter as the President and Chief Executive Officer of AdSTM. *Id*. Mr. Guan trusted that the position at AdSTM would be as promised because it had been offered to him by his sister, a high-level official with AdSTM.

Mr. Guan separated from his employment in Japan and moved himself and his family to the United States based on the position and conditions of employment represented to him by AdSTM. Am. Compl. ¶¶ 31-32. Ms. Guan, and by extension, AdSTM, was aware of her brother's vulnerabilities such as Mr. Guan's psychological concerns, his financial situation, and his need to support his family as he struggled with these difficulties. Ms. Guan was aware of her brother's vulnerabilities, including psychological concerns, financial struggles, and his need to support his family. She used this knowledge to manipulate Mr. Guan's vulnerabilities; she used her role at AdSTM, to place Mr. Guan in a position where he was compelled to continue working for AdSTM to adequately support himself and his family. Ms. Guan leased Mr. Guan housing for a rate of more than fifty percent of his net income and required that Mr. Guan conduct work for AdSTM from that location. Am. Compl. ¶¶ 34-35, 99-100; Exhibit D to the Am. Compl.

Further, this argument does not account for the actions of Mr. Guan or Ms. Guan on behalf of AdSTM or the practical effect of the non-competition agreement Mr. Guan was required to sign. Contrary to Defendant's contentions, Mr. Guan has alleged facts sufficient to demonstrate he was not free to seek alternate employment or leave the United States. AdSTM's

Mot. to Dismiss at p. 11. The threat of deportation Mr. Guan faced was not simply a legitimate, albeit adverse, consequence arising from immigration rules.

Mr. Guan was not free to simply leave his position at AdSTM and the consequences preventing him from doing so reached beyond those accounted for under relevant immigration law. Mr. Guan has sufficiently alleged that he was forced to remain employed at AdSTM while paying Mr. Ran half of his salary, as his failure to do so would result in his termination, inability to find alternate employment without subjecting himself to serious legal ramifications under the non-competition agreement, deportation of his family from the United States, and the potential loss of the home in which they resided. For these reasons, the allegations in Mr. Guan's Amended Complaint are sufficient to demonstrate that Mr. Guan was subjected to a condition of forced labor by AdSTM in violation of the TVPA.

At the motion to dismiss phase, the Court must credit Plaintiff's factual allegations. Plaintiff has alleged facts sufficient to establish that all Defendants named in the Amended Complaint believed a debt existed and that they held Mr. Guan to a condition of involuntary servitude as a result. The Court should deny AdSTM's motion to dismiss on Count I.

3.   *A Civil Remedy for Peonage Has Existed Since 2003.*

Defendant argues that Plaintiff's claims predate the TVPA's expansion of a civil remedy to claims for peonage. Defendant is incorrect; the TVPA, through Section 1595, provided for a civil remedy for violations of Sections 1589, 1590, and 1591 of the Act as early as the 2003 amendments.

Defendant's contention that a civil remedy for peonage was not available until the 2008 amendment to the Act (the "2008 Amendment"), is without merit. AdSTM's Mot. to Dismiss at p. 13.

19

The TVPA created a private right of action with respect to 18 U.S.C. §§ 1589, 1590, and 1591, and the form of trafficking upon which Plaintiff's allegations are based is provided for in the language of Section 1590. TVPA §§ 1590, 1595 (2003). Prior to the 2008 amendment, Section 1590 applied, in pertinent part, to "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590. "This chapter" referred to all trafficking-related violations, §§ 1581-1594.

Defendant cites to three cases for the proposition that Plaintiff cannot recover against AdSTM under Counts I and II of the Amended Complaint. In *Velez v. Sanchez*, all of the trafficking and forced labor allegations occurred before November 2003, one month before Congress created a civil action for such violations; as a result, the court found that the civil cause of action did not apply retroactively to the plaintiff's claims. 693 F.3d 308, 324-325 (2d Cir. 2012). Similarly, in *Ditullio v. Boehm*, the court considered whether the plaintiff could pursue a civil remedy against the defendant for conduct that occurred prior to December 2003. 662 F.3d 1091, 1099 (9th Cir. 2011). The court held that Section 1595 did not apply to pre-December 19, 2003 conduct. *Id.* at 1102. Neither of these cases speak to the relevant amendment, and Plaintiff makes no argument that any of the Defendants in the instant matter performed conduct prior to December 2003 that would create liability.

Prior to the 2008 Amendment to the TVPA, Section 1590 of the Act, titled "Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor" applied, in pertinent part, to "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590 (2003). "This chapter" contains all trafficking related violations, Sections 1581-1594. Therefore, Section 1595

20

of the TVPA, by reference to Section 1590, provided a civil remedy for peonage prior to the 2008 Amendment of the Act.[6]

Even if this Court reads the 2003 statute as excluding the peonage provisions, Sections 1581 and 1593 alleged in Counts I and II of the Amended Complaint, the civil remedy created in 2003 covered the activities alleged. The only case Defendant cites dealing whether Section 1595 provided a civil remedy for involuntary servitude under Section 1584 prior to 2008, is at odds with case law in this judicial district. In *Doe v. Siddig*, the court limited the plaintiff's claim for involuntary servitude for actions occurring after December 23, 2008. 810 F.Supp. 2d 127, 135 (D.D.C. 2011). However, this court has held that Congress enacted 18 U.S.C. § 1595 in "2003 to provide a private civil remedy for violations under 18 U.S.C. §§ 1581 (peonage), 1584 (sale into involuntary servitude), 1589 (forced labor), and 1590 (forbidding transport of forced labor)." *Iglesias v. Wal-Mart Stores East, L.P.*, 2009 U.S. Dist. LEXIS 132508 *7-8 (E.D. Va. 2009). *Inglesias* is the better reading of the law. The seminal case on retroactivity emphasized that court must evaluate whether imposing liability "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). Because Section 1581 is concerned with holding an individual for labor and services, the 2008 Amendment did not expand liability or impose new duties on Defendant.

Furthermore, even if this Court finds that Defendant did not incur liability until after the enactment of the 2008 Amendment, AdSTM remains liable for all actions taken after that date. As a result, this Court should not dismiss Counts I and II of Plaintiff's Amended Complaint.

---

[6] Defendant is correct in noting that the 2008 Amendment to the TVPA clarified this language so as to make clear that a civil remedy existed for all forms of trafficking provided for in Chapter 77 of the United States Code.

IV.     **THIS COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS COUNT II OF PLAINTIFF'S AMENDED COMPLAINT BECAUSE MR. GUAN HAS SUFFICIENTLY PLED THAT AdSTM BENEFITTED FINANCIALLY FROM PEONAGE AND TRAFFICKING.**

Defendant's contention that Count II of Plaintiff's Amended Complaint, alleging a violation for benefitting financially from peonage, slavery, and trafficking of victims requires a separate finding that Defendant engaged in those activities and is barred because the statute does not provide a civil remedy is incorrect. AdSTM's Mot. to Dismiss at p. 12. Section 1593(a) of the 2008 Amendment of the TVPA states:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of section 1581(a), 1592, or 1595(a), knowing or in reckless disregard of the fact that the venture has engaged in such violation, shall be fined under this title or imprisoned in the same manner as a completed violation of such section.

2008 Amendment, § 1593(a). While Section 1581(a) of the TVPRA relates to peonage, Section 1595(a) of the 2008 Amendment provides:

> An individual who is a victim of a violation *of this chapter* may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys['] fees.

2008 Amendment, § 1595(a) (emphasis added). "This chapter," as used in Section 1595, contains all trafficking related violations, §§ 1581-1594. Section 1595(a) is an enabling statute allowing civil suit for trafficking violations; Plaintiff is not required to allege a separate violation of Section 1595(a) in order to recover under it. As a result, a civil remedy has existed since the 2008 Amendment to the TVPA for deriving a financial benefit and/or receiving anything of

value as a result of any of the forms of trafficking prohibited by this Chapter 77, including, but not limited to, peonage.[7]

While Defendant is correct in noting that the 2008 Amendment does not generally operate retroactively, Count II of Plaintiff's Amended Complaint alleges an ongoing violation that, while beginning prior to the enactment of the 2008 Amendment, continued for many years thereafter, until at least September 2014. Defendant's contention that it is barred from civil liability under the 2008 Amendment because the "nucleus of facts" giving rise to Plaintiff's allegations of trafficking occurred prior to its enactment fails to account for the continuing nature of the unlawful actions at issue. AdSTM may still be found liable under Count II of Plaintiff's Amended Complaint for its actions in violation of the 2008 Amendment of the TVPA following its enactment. *See e.g., Elat v. Ngoubene*, 993 F. Supp. 2d 497 (D. Md. 2014) (holding that the version of the TVPA to be applied is that which was in effect during the events at issue).

However, even if this Court holds that Plaintiff cannot recover for Defendant's continuing violations prior to December 23, 2008, Defendant remains liable for all actions after that date. *See Doe*, 810 F.Supp. 2d at135.

For this reason, Plaintiff respectfully requests that Defendant's Motion to Dismiss as to Count II of Plaintiff's Amended Complaint be denied, and Plaintiff be entitled to proceed against Defendant under this claim.

**V.      THIS COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS COUNT V OF PLAINTIFF'S COMPLAINT AS PLAINTIFF HAS PROPERLY PLED AN**

---

[7] As a result, Defendant's statement that Counts I and II of Plaintiff's Amended Complaint state "identical" claims of peonage against AdSTM is also incorrect. AdSTM's Mot. to Dismiss at p. 2. Under Count II of Plaintiff's Amended Complaint, AdSTM may be found liable for benefitting financially from any of the prohibited forms of trafficking described in Chapter 77 of Title 18 of the United States Code.

**ACTUAL CASE OR CONTROVERSY AS REQUIRED TO SEEK DECLARATORY JUDGMENT.**

The Declaratory Judgment Act provides in pertinent part, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Defendant argues that Count V of Plaintiff's Amended Complaint seeking declaratory judgment and declaration of a non-competition agreement null and void should be dismissed because no actual case or controversy exists.

The language of the non-competition agreement itself demonstrates AdSTM's intent to enforce the agreement against Plaintiff, as well as the real likelihood that the agreement will be enforced. The language of the non-competition agreement prohibits Plaintiff from indicating his desire to leave AdSTM's employ without being subject to the legal ramifications of breaching the agreement. For this reason, a present, substantial controversy exists between the parties, who have immediate and real adverse legal interests. *See MedImmune Inc. v. Genetech, Inc.,* 549 U.S. 118, 127 (2008). Plaintiff is in fact under an imminent threat of harm unless the dispute is resolved.

Declaratory judgment "is appropriate when the judgment will serve a useful purpose in clarifying and settling legal relations in issue, and . . . when it will terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding. *Penn-Am. Ins. Co. v. Coffeey*, 368 F.3d 409, 412 (4th Cir. 2004) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)). Plaintiff's intent in seeking declaratory judgment is to eliminate the harm that would immediately result should he indicate his intent to leave his employment at AdSTM. For these reasons, Plaintiff has standing to request for declaratory judgment in Count V

24

of his Amended Complaint, and this Court should deny Defendant's motion to dismiss with respect to Count V.

### VI.   PLAINTIFF REQUESTS LEAVE TO AMEND IF THE COURT FINDS DEFICIENCIES IN THE COMPLAINT.

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires. '[T]his mandate is to be heeded.'" *Foman v. Davis,* 371 U.S. 178, 182, (1962). There are limited circumstances under which leave to amend should be denied. The Fourth Circuit has held that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber v. Harvey,* 438 F.3d 404, 426 (4th Cir. 2006) (quoting *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 509 (4th Cir. 1986)).

The discussion above demonstrates that Plaintiff's allegations as set forth in the operative Amended Complaint state plausible claims for relief under *Iqbal* and *Twombly* and, as such, Plaintiff is not acting in bad faith. If the Court determines that the Amended Complaint is insufficiently pled, Plaintiff requests leave to amend his Amended Complaint to provide further specificity as to any particulars of his claims. Such amendment would not be futile, and would be in the interests of justice without causing prejudice to Defendant.

### CONCLUSION

For the foregoing reasons, this Court should deny Defendant's Motion to Dismiss as to Count I, II, III, and V of Plaintiff's Amended Complaint and allow Plaintiff to proceed with these claims. If the Court finds deficiencies in Plaintiff's pleading, Plaintiff respectfully requests the Court grant him leave to amend his Complaint to provide further specificity as to any particulars of his claims.

Respectfully submitted,

Dated: June 7, 2017           By:      _____/s/_____

Joshua Erlich (VA Bar No. 81298)
Davia Craumer (VA Bar No. 87426)
Katherine L. Herrmann (VA Bar No. 83203)
**The Erlich Law Office, PLLC**
2111 Wilson Blvd
Suite 700
Arlington, VA  22201
Tel:    (703) 791-9087
Fax:    (703) 351-9292
Email: jerlich@erlichlawoffice.com
          dcraumer@erlichlawoffice.com
          kherrmann@erlichlawoffice.com

*Counsel for Plaintiff Fei Guan*

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2017, a true copy of the foregoing was filed electronically with the Clerk of the Court and served electronically using the CM/ECF upon:

Douglas E. Bywater (VSB No. 9137)
James R. Tate (VSB No. 6241)
Paul Mickelsen (VSB No. 71274)
Travis D. Tull (VSB No. 47486)
Tate Bywater Fuller Mickelsen & Tull, PLC
2740 Chain Bridge Road
Vienna, VA 22181
debywater@tatebywater.com
jtate@tatebywater.com
pmickelsen@tatebywater.com
ttull@tatebywater.com

*Counsel for Defendant Alice Guan*

James B. Kinsel (VSB No. 44247)
Rebecca Bricken Segal (VSB No. 73403)
PROTORAE LAW, PLLC
1921 Gallows Road, Suite 950
Tysons, VA, 22182
jkinsel@protoraelaw.com
rsegal@protoraelaw.com

*Counsel for Defendant Advanced Systems*
*Technology & Management, Inc.*

Mihir V. Elchuri (VSB No. 86582)
HIRSCHLER FLEISHER,
A PROFESSIONAL CORPORATION
8270 Greensboro Drive, Suite 700
Tysons, VA 22102
melchuri@hf-law.com

*Counsel for Defendant Qi Tech, LLC*

William B. Cummings, Esq. (VSB No. 6469)
William B. Cummings, P.C.
Post Office Box 1177
Alexandria, VA 22313
wbcpclaw@aol.com

*Counsel for Bing Ran*

27

_____/s/_____
Joshua Erlich, VA Bar No. 81298
Davia Craumer, VA Bar No. 87426
Katherine Herrmann, VA Bar No. 83203
The Erlich Law Office, PLLC
2111 Wilson Blvd.
Suite 700
Arlington, VA  22201
Tel:    (703) 791-9087
Fax:    (703) 351-9292
Email:  jerlich@erlichlawoffice.com
        dcraumer@erlichlawoffice.com
        kherrmann@erlichlawoffice.com


*Counsel for Plaintiff Fei Guan*

28