IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| FEI GUAN, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )   1:17cv332 (JCC/IDD) |
| | ) |
| BING RAN, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Bing Ran's ("Defendant Ran" or "Ran"), Defendant Alice Guan's ("Defendant Guan" or "Guan"), Defendant Advanced Systems Technology and Management, Inc.'s ("AdSTM"), and Defendant Qi Tech, LLC's ("Qi Tech") (collectively, the "Defendants") motions to dismiss for failure to state a claim under which relief can be granted. [Dkts. 38, 40, 44, 46, 47.] For the following reasons, the Court will grant Defendants' motion to dismiss Counts I-III. The Court will also grant Defendants' motion to dismiss Count V due to its failure to satisfy Article III's case or controversy requirement. Finally, the Court will decline to exercise supplemental jurisdiction over Count IV.

**I.   Background**

Fei Guan ("Plaintiff") brings this lawsuit against Defendants for claims arising under the Victims of Trafficking and

1

Violence Protection Act of 2003 ("TVPA" or the "Act"), 18 U.S.C. § 1581 *et seq.*, and Virginia common law.  All of Plaintiff's claims result from payments he sent to Defendant Ran from 2008 until 2014.  The following facts are taken from Plaintiff's Amended Complaint and, for the purposes of this motion, are presumed true.

Defendant AdSTM is an engineering and consulting firm that is headquartered in Northern Virginia.  Am. Compl., ¶ 5.  Defendant Guan, Plaintiff's sister, founded AdSTM in 1996.  *Id.*, ¶ 3.  In 2000, Defendant Ran—Defendant Guan's then-husband—began assisting her in running the company.  *Id.*, ¶¶ 3-4.  Though the two are now divorced, Defendant Guan and Defendant Ran still jointly manage AdSTM today.  *Id.*, ¶ 5.

In early 2008, while Plaintiff was living in Japan,[1] Defendant Guan offered Plaintiff a job with AdSTM as an analyst.  Am. Compl., ¶ 20.  Plaintiff alleges that Defendant Guan verbally represented that his annual salary would be between $70,000 and $80,000, *id.*, ¶ 22, although the actual salary field on his February 2008 offer letter was left blank, *id.*, ¶ 21.  AdSTM also offered to sponsor Plaintiff's H-1B temporary work visa, so he accepted the job.  *Id.*, ¶¶ 24, 28-29.  After obtaining the advice of an immigration attorney, Defendant Guan submitted Plaintiff's visa paperwork in April 2008.  *Id.*, ¶ 29.  Plaintiff's visa

---

[1] Plaintiff was born in China and is now a lawful permanent resident of the United States.  Am . Compl., ¶ 1.  He resides in Virginia.  *Id.*

2

application was subsequently approved. He moved to the United States with his family in late September 2008,[2] *id.*, ¶ 31, and began working at AdSTM in early October, *id.*, ¶ 94.

Plaintiff's allegations center on two different agreements. First, Plaintiff focuses on a Parenting, Support, and Property Settlement Agreement (the "PSA") negotiated between Defendants Guan and Ran during their divorce. Am. Compl., ¶¶ 45-69. The PSA set forth various terms regarding the management and ownership of AdSTM. *Id.*, ¶ 46. On or about June 10, 2008, Defendants Guan and Ran agreed upon an amendment to the PSA (the "June 2008 Amendment"), which provided in part for the continued employment of Plaintiff at AdSTM, based upon the following terms:

> As long as AdSTM has revenue of not less than $3M/year, Bing Ran and AdSTM shall employ . . . Fei Guan continuously for 5 years . . . and proactively sponsor [his] H-1 and Green Card processes. [His] salary will be $75K/year. [He] will give Bing Ran half of [his] net income from AdSTM.

*Id.*, ¶ 51. The June 2008 Amendment also provided that if Plaintiff refused or failed to make any payments after being reminded to do so, AdSTM would "have no obligation to pay and hire" him. *Id.* Plaintiff alleges that he had no knowledge of the terms of this agreement prior to his arrival to the United States. *Id.*, ¶¶ 52-53.

---

[2] Plaintiff rented a house from Defendant Guan for $1300 per month. Am. Compl., ¶ 35. In September 2009, Defendant Guan also began charging Plaintiff for utilities. *Id.*, ¶ 36. Plaintiff and his family resided at this home until June 2012. *Id.*, ¶ 37. Plaintiff alleges that he paid Defendant Guan nearly $60,000 in rent (not including utilities). *Id.*, ¶ 120.

3

Several months later, after Plaintiff had already moved to the United States and started working at AdSTM, Defendants Guan and Ran amended the PSA a second time (the "October 2008 Amendment"). Am. Compl., ¶ 56. The October 2008 Amendment adjusted his term of employment at AdSTM from five years to approximately three years. *Id.*, ¶ 58. The requirement that Plaintiff pay half of his net income each month to Defendant Ran remained the same. *Id.* Plaintiff again alleges that he had no knowledge of the terms of this agreement at the time that it was executed. *Id.*, ¶¶ 62-65.

Prior to Plaintiff's first day of work in early October 2008, Plaintiff alleges that Defendant Guan informed him that he would be required to pay half of his monthly net income to Defendant Ran. Am. Compl., ¶ 70. Plaintiff also alleges that Defendant Guan told him that if he failed to make these payments, his employment would be terminated and he would have no choice but to leave the United States. *Id.*, ¶ 71. Plaintiff accepted this arrangement based upon an alleged fear of his and his family's immigration statuses. *Id.*, ¶¶ 76-77.

Beginning in October 2008 until August 2014, Plaintiff sent a check for one-half of his net income to Defendant Ran each month, totaling approximately $160,000. Am. Compl., ¶¶ 97-98, 118-19. In early September 2014, Plaintiff alleges that Defendant Ran told Plaintiff he could stop sending these monthly payments.

*Id.*, ¶ 122. Two months later, Defendant Ran asked Plaintiff to execute a legal agreement indicating that the payments Plaintiff had made to Defendant Ran were related to personal loans. *Id.*, ¶ 123. Plaintiff alleges that Defendant Ran had never previously described these payments as loans. *Id.*, ¶ 124. Furthermore, the agreement Defendant Ran wanted Plaintiff to sign did not describe them as loans. *Id.*, ¶ 127. Eventually, Defendant Ran dropped the issue. *Id.*, ¶ 128.

Plaintiff's allegations also involve a second agreement: an "Employee Proprietary Information and Non-Compete Agreement" (the "Non-Compete Agreement"). Plaintiff alleges that this agreement prevented him from discussing his compensation with anyone but his direct supervisor (Defendant Guan) or higher officers at AdSTM (at the time, Defendant Ran, who was CEO), submitting his resume to any potential employers who directly competed against AdSTM's products and services, and working for any person or entity who had previously paid AdSTM for services and with whom Plaintiff had any dealing while employed at AdSTM. *Id.*, ¶¶ 39, 41-42, 88-89. It also provided for a permanent injunction in the event of any breach or threatened breach. *Id.*, ¶ 40. Plaintiff argues that, as a direct result of this Non-Compete Agreement, he was prevented from seeking another H-1B visa sponsor. *Id.*, ¶ 80.

While employed at AdSTM, Plaintiff alleges that he also performed work for another company, Qi Tech. Am. Compl., ¶ 147. Qi Tech had entered into numerous Mentor/Protégé Agreements with AdSTM for the provision of management and support services. *Id.*, ¶ 148. Plaintiff alleges that, under Defendant Ran's direction, he was required to perform work for Qi Tech from October 2010 until August 2014. *Id.*, ¶ 151. Plaintiff acknowledges that he was paid a bonus from Qi Tech in 2011, as well as numerous other bonuses from AdSTM. *Id.*, ¶¶ 131-32. In or around October 2013, Plaintiff asked Defendant Ran to stop providing him these bonuses and, in exchange, Plaintiff would no longer have to send Defendant Ran half of his monthly income. *Id.*, ¶ 138. Defendant Ran allegedly declined Plaintiff's offer. *Id.*, ¶ 139. In total, Plaintiff received approximately $79,000 in bonuses from October 2010 until September 2014. *Id.*, ¶ 144. Plaintiff also admits that he was reimbursed for certain expenses he incurred on behalf of Qi Tech. *Id.*, ¶ 152.

Plaintiff filed the instant case on March 24, 2017. [Dkt. 1.] The Amended Complaint alleges five different counts, including: (1) peonage, in violation of the TVPA, against Defendants Guan, Ran, and AdSTM; (2) benefitting financially from peonage, slavery, and trafficking in persons, in violation of the TVPA, against all Defendants; (3) trafficking, in violation of the TVPA, against Defendants Guan, Ran, and AdSTM; (4) unjust

6

enrichment against Defendants Guan and Ran; and (5) a request for a declaratory judgment to void Plaintiff's Non-Compete Agreement against AdSTM. [Dkt. 33.]

Oral argument was held on June 29, 2017. Having been fully briefed and argued, these motions are now ripe for disposition.

## II. Legal Standard

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Supreme Court has stated that in order "[t]o survive a motion to dismiss, a [c]omplaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citations omitted). While legal

conclusions can provide the framework for a complaint, all claims must be supported by factual allegations. *Id.* Based upon these allegations, the court must determine whether the plaintiff's pleadings plausibly give rise to an entitlement to relief. *Id.* Legal conclusions couched as factual allegations are not sufficient, *Twombly*, 550 U.S. at 555, nor are "unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). The plaintiff, however, does not have to show a likelihood of success; rather, the complaint must merely allege – directly or indirectly – each element of a "viable legal theory." *Twombly*, 550 U.S. at 562-63.

At the motion to dismiss stage, the court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *Iqbal*, 556 U.S. at 678. Generally, a district court does not consider extrinsic materials when evaluating a complaint under Rule 12(b)(6). It may, however, consider "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006). In addition, the court may consider documents attached to the defendant's motion to dismiss if those documents are central to the plaintiff's claim or are "sufficiently referred to in the complaint," so long as the

plaintiff does not challenge their authenticity.  *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006).

Finally, Plaintiff's theory of the case must not only pass the test of *Twombly* and *Iqbal*, but also must be strictly construed.  *See Crandon v. United States*, 494 U.S. 152, 158 (1990) (applying the rule of lenity where the governing standard in a civil case is embedded in a criminal statute); *Fed. Communications Comm'n v. Am. Broad. Corp.*, 347 U.S. 284, 296 (1954) (noting that criminal statutes must be strictly construed, even when they are applied in civil cases).

### III. Analysis

Plaintiff's claims under the TVPA fall into two categories: (1) Plaintiff's claim that he was "held to" a condition of peonage in violation of Section 1581(a) (First Claim for Relief); and (2) Plaintiff's claims alleging that Defendants benefitted financially from peonage or trafficking under 18 U.S.C § 1593A (Second Claim for Relief) and committed trafficking under 18 U.S.C. § 1590 (Third Claim for Relief), both of which depend upon Defendants' alleged violations under Sections 1581(a). Plaintiff also includes a request for declaratory relief regarding his Non-Compete Agreement with AdSTM and a state law claim for unjust enrichment.  The Court will address each of Plaintiff's claims in turn.  Additionally, the Court will also address

Plaintiff's request for leave to amend his Complaint for a third time. [*See* Dkts. 51-54.]

A. <u>Plaintiff's Claim Alleging a Condition of Peonage Under Section 1581(a) of the TVPA</u>

Plaintiff's first claim in the Amended Complaint is an allegation that he was "held to" a condition of peonage by Defendants Guan, Ran, and AdSTM. The Supreme Court has defined "peonage" as "a status or condition of compulsory service, based upon the indebtedness of the peon to the master. The basal fact is indebtedness." *Clyatt v. United States*, 197 U.S. 207, 215 (1905). The TVPA provides a civil remedy for victims of peonage, stating in relevant part: "Whoever holds . . . any person to a condition of peonage . . . shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1581(a).

Defendant AdSTM argues that the alleged misconduct in the Amended Complaint took place prior to Congress providing a civil remedy for peonage via the TVPA. Def. AdSTM's Mem. in Supp. of Mot. to Dimiss [Dkt. 49] at 13. AdSTM points out that Congress first provided a civil remedy to victims of trafficking in 2003, but this remedy was limited to claims involving forced labor; trafficking with respect to peonage, slavery, forced labor, or involuntary servitude; and sex trafficking. *Id.* (citing Pub. L. No. 108-193, § 4(a)(4)(A) (2003)). It was not until December 23, 2008, that Congress expanded the TVPA's civil remedy provision to

all violations of any section of Chapter 77, including Plaintiff's peonage claims in the instant case. *Id.* (citing Pub. L. No. 110-457 (2008)). Because Plaintiff made his first payment to Defendant Ran in October 2008, Defendant argues that the nucleus of facts giving rise to his allegations predates the December 2008 civil remedy expansion. *Id.* Furthermore, the TVPA is not retroactive. *Id.* Thus, Defendant argues that Count I should be dismissed. *Id.*

In addition, Defendant AdSTM contends that the Amended Complaint fails to allege the requisite indebtedness, real or otherwise. Def. AdSTM's Mem. in Supp. of Mot. to Dismiss at 13. In fact, AdSTM asserts that Plaintiff's Amended Complaint goes to great lengths to avoid describing his payments to Defendant Ran as a debt of any kind. *Id.*

Finally, Defendant AdSTM argues that the Amended Complaint fails to establish that Plaintiff was forced to work for AdSTM against his will. Def. AdSTM's Mem. in Supp. of Mot. to Dismiss at 8. In support of this argument, AdSTM contends that the Amended Complaint alleges only that Defendant Guan warned Plaintiff that if he stopped making payments to Defendant Ran, his employment at AdSTM would be terminated and he would lose his H-1B visa status. *Id.* at 9. Although Plaintiff argues that this alone made him feel as if he had no other options, AdSTM asserts that Plaintiff could have pursued a new sponsoring employer for his H-

11

1B visa at any time. *Id.* Moreover, AdSTM points out that the TVPA was not intended to prohibit employers from acknowledging legitimate consequences that could arise from an employee's voluntary or involuntary termination. *Id.*

As a preliminary matter, although Defendant AdSTM is correct that the TVPA does not operate retroactively, *see Doe v. Siddig*, 810 F. Supp. 2d 127, 136 (D.D.C. 2011), AdSTM is incorrect in its conclusion that Plaintiff's entire peonage claim should be dismissed on that basis. Rather, the TVPA's December 2008 expansion only serves to limit Plaintiff's Amended Complaint to those events that allegedly took place after its passage on December 23, 2008.

Having limited Plaintiff's Amended Complaint to the relevant alleged facts, as well as drawn all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has failed to state a claim upon which relief can be granted. Although Plaintiff has included sufficient facts to suggest the existence of an imagined debt, Plaintiff has failed to allege sufficient facts to suggest that he was forced to work at AdSTM against his will. In fact, he continues to work there today. The only threats in his Amended Complaint came from his sister, Defendant Guan, and included warnings about the likelihood of losing his employment with AdSTM and his H-1B visa if he failed to make the payments to Defendant Ran each month. Amend. Compl., ¶¶ 71, 75,

97-98.  However, as Defendant AdSTM correctly notes, there is no violation of the TVPA if an employer merely informs an employee about legitimate immigration consequences that may arise from that employee's termination.  *See Muchira v. Al-Rawaf*, 850 F.3d 605, 622-25 (4th Cir. 2017).  In addition, Plaintiff is a highly educated employee who has earned, and continues to earn, a healthy salary at AdSTM.  He certainly has the resources to investigate whether his Non-Compete Agreement—which the Amended Complaint holds out as additional proof of his psychological coercion—was legally enforceable, as well as to inquire about the possibility of pursuing employment elsewhere.  Accordingly, the Court will grant Defendant AdSTM's motion to dismiss Count I.

For all the reasons discussed above, Plaintiff's peonage claim also fails with respect to Defendants Guan and Ran.  The Court will therefore dismiss Count I with respect to all three defendants.

B. <u>Plaintiff's Additional TVPA Claims that Depend Upon a Violation of Section 1581(a)</u>

Plaintiff's second and third claims involve allegations that Defendants (1) recruited, transported and harbored him in order to hold him in a condition of peonage in violation of Section 1590 (Third Claim for Relief); and (2) knowingly benefitted financially from participating in a venture that violated Section 1581(a) (Second Claim for Relief).  Having

13

concluded that there is insufficient evidence in the record to support Plaintiff's claim that Defendants AdSTM, Guan, and Ran violated Section 1581(a), or any other predicate offense under the TVPA, Plaintiff's remaining claims under the TVPA must necessarily be dismissed against all Defendants, including Defendant Qi Tech.[3]

C. <u>Plaintiff's Declaratory Judgment Claim to Void AdSTM's Non-Compete Agreement</u>

Plaintiff's Amended Complaint also includes a request for a declaratory judgment regarding the Non-Compete Agreement he signed before beginning his employment at AdSTM. The Declaratory Judgment Act (the "DJA") is not a jurisdictional grant. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950). Rather, its purpose is to allow federal courts to exercise jurisdiction only in cases that: (1) meet the case or controversy requirement; and (2) present a valid basis for subject matter jurisdiction. *Dunn Computer Corp. v. Loudcloud, Inc.*, 133 F. Supp. 2d 823, 826 (E.D. Va. 2001). Moreover, "even where a request for a declaratory judgment meets both of these requirements, the exercise of declaratory jurisdiction [still] rests within the sound discretion of the district court." *Id.*

First, a declaratory judgment action must satisfy the case or controversy requirement of Article III of the United States Constitution. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S.

---

[3] Section 1593A requires a violation of §§ 1581(a), 1592, or 1595(a). Section 1590 and § 1595(a) require the showing of other actions in "violation of this chapter."

118, 126-27 (2007). To be justiciable, a controversy must be "definite and concrete, touching the legal relationships of parties having adverse ... interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937). It also must be "real and substantial," rather than "an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 241. Finally, it must be "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127. Such an inquiry is fact-intensive. *Id.*

In the instant case, Petitioner fails to satisfy the Article III case or controversy requirement due to lack of immediacy. Plaintiff has failed to allege sufficient facts to establish a real and immediate danger with regards to the Non-Compete Agreement. Defendant AdSTM has never sought to enforce the Non-Compete Agreement against Plaintiff. In fact, based on AdSTM's pleadings in this case, it appears that AdSTM has no intention of doing so and would be more than happy to oblige Plaintiff's potential desire to seek employment elsewhere. "Where, as here, a declaratory judgment request rests entirely on speculation and conjecture, there is no 'sufficient immediacy' to warrant a discretionary grant of declaratory relief." *Firestone v. Wiley*, 485 F. Supp. 2d 694, 700 (E.D. Va. 2007) (citing *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir.

15

1998) (noting that declaratory judgment jurisdiction should not be exercised when the declaratory relief sought is premature)).

Given that Count V of the Amended Complaint does not meet the constitutional case or controversy requirement, this Court is without subject matter jurisdiction to decide its claims. Accordingly, the Court will grant Defendants' motion to dismiss Count V.

D. <u>Plaintiff's Remaining State Law Claim</u>

Plaintiff's final claim involves a Virginia state law claim based upon unjust enrichment.[4] This claim is brought against Defendants Guan and Ran only. Because the Court has dismissed all of Plaintiff's federal claims, there is no federal question jurisdiction in this case. Complete diversity of citizenship also does not exist, as required by 28 U.S.C. § 1332(a), thereby precluding this Court's subject matter jurisdiction.[5]

"Given that [Plaintiff's] federal claims have been dismissed, the Court must determine whether to continue to exercise supplemental jurisdiction over the state law

---

[4] Plaintiff concedes, and the Court agrees, that his unjust enrichment claim is limited to March 24, 2014 (the three years immediately preceding the filing of his lawsuit) until September 2014. Am. Compl., ¶ 210.

[5] Plaintiff is a resident of Virginia. Am. Compl., ¶ 1. Though Defendant Guan is diverse to Plaintiff, *id.*, ¶ 3, the remaining defendants are not. Defendant Ran is a resident of Virginia, *id.*, ¶ 4, Defendant AdSTM's principal place of business and headquarters are in Virginia, *id.*, ¶ 5, and Defendant Qi Tech's principal place of business and headquarters are also in Virginia, *id.*, ¶ 7. *See Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 102 (4th Cir. 2011) ("For federal diversity jurisdiction purposes, a corporation is a citizen of the states in which it has been incorporated and in which it has its principal place of business.")

16

claims." *J.S. ex rel. Simpson v. Thorsen*, 766 F. Supp. 2d 695, 712 (E.D. Va. 2011). The doctrine of supplemental jurisdiction states that federal courts have discretion to retain or dismiss non-federal claims when the federal basis for an action is no longer applicable. *See* 28 U.S.C. § 1367 (codifying *United Mine Workers of America v. Gibbs,* 383 U.S. 715 (1966)). A district court has discretion to dismiss a case where, as here, the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

In the Fourth Circuit, "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan,* 58 F.3d at 110. Courts take a number of factors into consideration in making this discretionary determination: "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id.* (citing *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n.7 (1998)). As the *Shanaghan* court points out, "the doctrine of supplemental jurisdiction 'is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values.'" *Id.* (*quoting Cohill,* 484 U .S. at 350).

Having dismissed all of Plaintiff's federal claims, as

well as determined that diversity of citizenship does not exist, the Court will decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claim. Accordingly, Plaintiff's unjust enrichment claim will be dismissed for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).

In dismissing Plaintiff's claim, the Court notes that nothing in the record appears to bar Plaintiff from pursuing his claim in state court, and therefore Plaintiff is not without a forum in which to seek redress. *See* Va. Code § 8.01-229(E) (permitting tolling of the statute of limitations for pending actions) and 28 U.S.C. § 1367(d) (same); *see also Welding, Inc. v. Bland Cnty. Serv. Auth.*, 541 S.E.2d 909, 912 (Va. 2001) (holding that Virginia Code § 8.01-229(E)(1) applies to actions in federal court).

E.  Plaintiff's Request for Leave to Amend

At the end of each of his briefs in opposition, Plaintiff requests leave to amend a second time if the Court finds deficiencies in his Amended Complaint. [*See* Dkts. 51-54.] Plaintiff does not include any specific proposed amendments. [*Id.*]

A party may amend its complaint after a responsive pleading has been served "only by leave of court or by written

consent of the adverse party."[6]  Fed. R. Civ. P. 15(a).  Rule 15 of the Federal Rules of Civil Procedure directs that "leave shall be freely given when justice so requires."  *Id.*  The liberality of the rule "gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities."  *Laber v. Harvey,* 438 F.3d 404, 426 (4th Cir. 2006) (citing *Conley v. Gibson,* 355 U.S. 41, 48 (1957)).  Therefore, "leave to amend a pleading should be denied 'only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'"  *Edwards v. City of Goldsboro,* 178 F.3d 231, 242 (4th Cir. 1999) (quoting *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 509 (4th Cir. 1986)).

In the instant case, Plaintiff did not act in bad faith in including a request for leave to amend in his opposition briefs.  Because this case is still in its early stages, the Court also finds that allowing leave to amend the Amended Complaint a second time would not be unduly prejudicial to Defendants.  However, such an amendment would be futile.  Plaintiff has not identified any revisions that would allow his Amended Complaint to survive a Rule 12(b)(6) motion to dismiss.  The Court also cannot identify any ways in which Plaintiff could cure the defects.

---

[6] All four Defendants oppose Plaintiff's request.  [*See* Dkts. 55-58.]

Accordingly, Plaintiff's request for leave to amend will be denied.

## IV. Conclusion

For the reasons set forth above, the Court will grant Defendants' motion to dismiss Counts I-III under Rule 12(b)(6). The Court will also grant Defendants' motion to dismiss Count V due to failure to satisfy Article III's case or controversy requirement. In addition, the Court will grant Defendants' motion to dismiss Count IV, as this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim. Finally, the Court will deny Plaintiff's request for leave to amend.

An appropriate order will follow.

|  | /s/ |
|---|---|
| July 6, 2017 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |